569 So.2d 678 (1990)
William "Hank" PETTIT
v.
STATE of Mississippi.
No. 07-KA-59076.
Supreme Court of Mississippi.
October 17, 1990.
Charles "Bo" Little, Pontotoc, for appellant.
Mike C. Moore, Atty. Gen., Billy L. Gore, Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and ANDERSON and PITTMAN, JJ.
PITTMAN, Justice, for the Court:
William "Hank" Pettit was convicted for the sale of Dilaudid in Pontotoc County Circuit Court and was sentenced to twenty (20) years in the custody of the Mississippi Department of Corrections. On appeal Pettit raises five (5) errors. Finding these meritless, we affirm the conviction and sentence.
In August 1986, Tim Rutledge and Mike Berthay were working out of the Tupelo office of the Mississippi Bureau of Narcotics. They were at that time approached by one Randy Paine, who offered to assist them in setting up drug purchases in the Pontotoc area. On August 15, 1986, Berthay and Paine went to the home of Melanie Keith, located on Old Highway 41, south of Pontotoc. Berthay was wearing a wire or radio transmitter under his shirt. Hank Pettit was at the Keith house when they arrived. Melanie Keith arrived a few minutes later, stopping outside to talk to Berthay and Paine. The discussion turned to Dilaudid, with Berthay and Keith haggling over the price. According to Berthay, Keith continually referred to a "he" *679 as being in control of the price. Keith went into the house for a few minutes and then returned, saying that "he was having to pay more, so he was having to collect more than twenty-five dollars for the Dilaudid, so if I wanted them, I would have to take them for that (the higher price)." Berthay agreed to pay $32.50/tablet for five tablets, but asked for a clear understanding that if he came back to buy in bulk, the price would not be any higher. Berthay and Keith walked into the kitchen. Keith then removed the five tablets from a drawer, wrapped them in cellophane, and gave them to Berthay. Berthay paid with a hundred dollar bill and three twenties, all marked bills. Berthay again asked Keith for an assurance that the price would be the same the next time he came. According to Berthay, "[s]he turned around and went straight to Mr. Pettit who was standing near the kitchen, the living room comes around into the kitchen bar area, the couch area, with a coffee table and couch. They got up, went down the hall that goes from the kitchen, couple bedrooms on that end of the house, I assume, walked to the end of the hall, stepped inside the bedroom door for just a minute. She come back; Mr. Pettit was standing at the end of the hall near the kitchen area, and she looked at me and told me it wouldn't be any higher than what I had paid. I told her I appreciated it and I would be back and order some more." Also on this point, Berthay said that "[Keith] motioned or went to Hank, motioned, and he got up and they went down the hall, obviously there was a bedroom on the left, the door was open, they just stepped inside the door, and obviously there was a discussion going on between the two of them... . They talked for a little bit, she came back. She came directly back to me and said that the price would not be any higher." Berthay did not know what happened to the money, saying that he left it on the countertop. A tape recording of the transaction, made via the transmitter worn by Berthay, was introduced as State's Exhibit 1. The tape was played for the jury once all the way through, and then portions were replayed at defense counsel's request.
Melanie Keith testified that Hank Pettit was supplying drugs to her and setting the price of the drugs. On the afternoon of August 15, Hank and his ex-wife Cathy Pettit came over to Keith's house. According to Keith, the Pettits had been coming by every day or so for a couple of weeks because of the regular stream of drug customers stopping by. Keith further testified that Hank Pettit asked her about the two potential customers when he first arrived. Keith said that she discussed the price with Paine and Berthay, went inside to confirm it with Hank Pettit, came out and told the two that it would have to be $32.50/tablet, and went back in to tell Pettit that they had accepted the price. According to Keith, Pettit did not want anyone to see him handle the tablets, so he poured five tablets into the kitchen drawer and left them there for Berthay to pick up.
Hank Pettit testified that he and his ex-wife were at Melanie Keith's house only to ask her about a job for Cathy Pettit at the furniture upholstery factory where Keith worked. Pettit admitted that Melanie Keith was selling drugs in the house that day, but said that when he realized it he fled to the bathroom and locked himself in. He denied that he had anything to do with the sale of Dilaudid that day at Melanie Keith's house. Cathy Pettit testified that the Dilaudid was hers, that she had given them to Melanie Keith, and that she had received the money left by Berthay.
Mike Berthay was called as a rebuttal witness for the State. He denied that he had seen any transfer of any substance from Cathy Pettit to Melanie Keith. On cross-examination Berthay denied that he and Randy Paine and Hank Pettit had smoked a marijuana cigarette. Berthay denied that it was part of his undercover work to simulate smoking marijuana, and denied that he had ever simulated smoking marijuana. On redirect Berthay went into further detail about the Bureau's rigorous prohibition on the use of drugs.
The State rested after Berthay's testimony. The instructions were discussed. Before the jury was brought back in, Hank Pettit asked to call a surrebuttal witness, *680 Jeff Simmons, who would testify that he had seen Agent Berthay roll a marijuana cigarette at Melanie Keith's house on August 15. The State objected, saying that impeachment should not be allowed on a collateral matter. The trial court overruled the objection, then, once the jury was brought in, reversed itself and declined to allow the testimony.
During his closing argument, defense counsel encouraged the jury to listen to the tape made via the body wire worn by Agent Berthay, arguing that the tape would help substantiate Hank Pettit's version of the drug sale. The trial court interrupted, "Just a moment. They can't listen to the tape any more than they already have. It does not go back into the jury room any more than a transcript of what other witnesses said." The tape recording, State's Exhibit 1, was not submitted to the jury during its deliberations.

I. DID THE TRIAL COURT ERR WHEN IT REFUSED TO ALLOW THE TAPE RECORDING MADE BY THE STATE AND INTRODUCED INTO EVIDENCE TO GO TO THE JURY DURING DELIBERATIONS?
Hank Pettit first argues that the trial court erred when it refused to allow the tape made via Agent Berthay's body wire, State's Exhibit 1, to be submitted to the jury, as the other exhibits were. The trial court would not allow this, likening the tape to a transcript of trial testimony.
Miss. Code Ann. § 99-17-37 (1972) states that "[a]ll papers read in evidence on the trial of any cause may be carried from the bar by the jury." More to the point, Miss. Unif.Crim.R.Cir.Ct.Prac. 5.14 states in part:
The court shall permit the jury, upon retiring for deliberation, to take to the jury room a copy of the instructions and exhibits and writings which have been received in evidence, except depositions.
Pettit relies on Coulter v. State, 506 So.2d 282 (Miss. 1987). In Coulter, the appellant confessed to the crime in question, and the confession was transcribed by the police. The written confession was introduced into evidence and was carried into the jury room during deliberations. Relying on § 99-17-37 and Rule 5.14, this Court found that there was no error in allowing the written confession to be carried into the jury room, emphasizing that "[t]he Court shall permit" this action. Coulter, 506 So.2d at 286 (emphasis in original). The State argues that, despite the apparently mandatory language of the rule, the trial court still possesses discretion to regulate what evidentiary exhibits go to the jury. The State also argues that the jury heard the tape once during the trial, and certain portions more than once, so that any error was harmless.
We hold that, considering Coulter and the language of 5.14, the rule is, within reason, mandatory. The trial court would have discretion to withhold exhibits that might be dangerous or prone to destruction. There is the possibility that, even though a tape recording is submitted to the jury, the jury will not ask to have it played. The trial court would also have broad discretion to regulate the presentation of the tape recording to the jury, such as limiting the number of replays.
State's Exhibit 1 is of poor quality. The jury heard it once in its entirety, and then heard certain parts a second time. Though the trial court erred when it refused to let the tape recording go to the jury with the other exhibits, the error was harmless under the circumstances.

II. DID THE TRIAL COURT ERR IN REFUSING TO ALLOW JEFF SIMMONS TO TESTIFY IN SURREBUTTAL?
Cathy Pettit testified that she gave the Dilaudid to Melanie Keith right in front of Mike Berthay. Berthay was called by the State in rebuttal, and he testified that he had not seen any transfer of any substance from Cathy Pettit to Melanie Keith. On cross-examination, Berthay denied that he and Randy Paine and Hank Pettit had smoked a marijuana cigarette. Berthay also denied that it was part of his undercover role to simulate smoking marijuana, and he denied that he had ever simulated *681 smoking marijuana. On redirect Berthay went into some detail concerning the strict prohibition of the Mississippi Bureau of Narcotics against use or simulated use of a controlled substance, including the use of polygraphs and random drug tests, and the consequences of dismissal and prosecution. Hank Pettit then attempted to call Jeff Simmons to testify that he had seen Berthay roll a marijuana cigarette that day at Melanie Keith's house. The State objected, claiming that impeachment should not be allowed on a collateral matter. The trial court at first stated that it would allow the testimony, but then reversed itself and sustained the objection.
The State argues that Miss.R.Evid. 608(b) prohibits the kind of testimony that Pettit was seeking to introduce. 608(b) states:
(b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.
For a specific application of Rule 608(b), the State cites Pinson v. State, 518 So.2d 1220 (Miss. 1988). In Pinson, the husband of a rape victim had testified that his marriage had broken up because of the rape, and that he was separated from his wife and not living with another woman. The defense attempted to call a witness who would have testified that the husband was living with another woman. The trial court would not allow the testimony. This Court affirmed, relying in part on Rule 608(b):
Specific instances of conduct under our Rules of Evidence may not be proved by extrinsic evidence for impeachment purposes; they may only be inquired about on cross-examination. J.W. denied seeing any woman other than his wife when he was questioned about it on cross-examination. The defense may go no further.
Pinson, 518 So.2d at 1223. The State also relies on Pinson for the proposition that Simmons's testimony would amount to impeachment on a collateral matter and was thus prohibited. Pettit argues that, considering the detail that the State went into on redirect with Berthay concerning the MBN's policy concerning its agents and controlled substances, that the matter cannot be considered a collateral one. It would have been preferable under the circumstances of this case for the trial court to have allowed Jeff Simmons to testify, but the court's action does not amount to reversible error. We have considered the other issues raised by the Appellant and find them without merit. The conviction and sentence of Hank Pettit are affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.