BARNES, J.,
 

 for the Court.
 

 ¶ 1. Leon Lamar Trotter was tried and convicted in the Circuit Court of Hum-phreys County for the murder of Ricky Hill. Trotter received a sentence of life in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved, Trotter appeals, raising several issues. Finding no error, we affirm.
 

 SUMMARY OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. In the early evening of June 12, 2003, Truron Grayson, an off-duty officer with the Belzoni Police Department, was playing basketball near Hill’s house in Silver City, Mississippi. Someone approached and advised Officer Grayson that Hill was lying in the doorway to his home; so Officer Grayson went to investigate. Officer Grayson testified that he did in fact find Hill lying in his doorway. Hill told Officer Grayson, “Man, I need some help. I’m cold.” Officer Grayson testified that Hill was falling in and out of consciousness. When Officer Grayson asked Hill what happened, Hill said he had been shot and could not move. When asked who did it, Hill responded, “Pooh Man ... the guy who lives down the street ... drives the blue Cadillac, lives in that trailer.” Officer Grayson knew Trotter was known in the community as “Pooh Man” and fit this description.
 
 [1]
 
 At this time, Officer Grayson also noted an entry wound in the upper part of Hill’s chest. Later, it was determined that Hill had been lying in his doorway with the gunshot wound for approximately seventeen hours. As a result of the injury, Hill died in the hospital thirteen days later.
 

 ¶ 3. At the scene, Officer Grayson and Chief Deputy J.D. Roseman decided to locate Trotter. As they approached the trailer where Trotter lived, they noticed a Cadillac traveling further down the road. Michael Trotter, Leon’s cousin, was driving the vehicle, and Alvin Pittman was the passenger. After stopping the Cadillac, officers recovered a .380 handgun from under the driver’s seat. Pittman was taken into custody. Officers Grayson and Roseman then spotted Trotter in another vehicle in the vicinity and took him into custody.
 

 ¶ 4. At the sheriffs department, Trotter was advised of and waived his
 
 Miranda
 
 rights. Not long after he was taken into custody, Trotter voluntarily made two handwritten statements that evening.
 
 [2]
 
 In the first statement, Trotter briefly recounted that at approximately midnight, he and Pittman went to Hill’s house and knocked on the door. When Hill asked who was there, Trotter responded “Cliff.” Hill then opened the door, and Pittman shot him. Trotter’s second statement, which was made approximately an hour later, did not contradict his earlier statement, but contained more details. Trotter stated that he and Pittman decided to go to Hill’s home to collect a thirty-five-dollar
 
 *406
 
 debt for some marijuana which Trotter had sold Hill “on credit.” They parked the car at a nearby church and walked to Hill’s home. After Pittman shot Hill, Pittman started running; so Trotter followed. They drove back to Trotter’s house and ate. When Trotter told Pittman that Hill might die, Pittman acknowledged, “I shot him in the heart.” Trotter then claimed Pittman said the only reason he shot Hill just once was because his gun jammed up. Trotter stated that the two men then went to sleep.
 

 ¶ 5. A Humphreys County grand jury returned a two-count indictment against Trotter and Pittman for deliberate-design murder and the manufacture of marijuana. Pittman filed a motion for severance, which was granted. Ultimately, Pittman entered a guilty plea to manslaughter and was sentenced to twenty years in the custody of the MDOC.
 

 ¶ 6. At Trotter’s trial, several witnesses testified for the State. Officer Grayson’s testimony regarding Hill’s dying declaration was entered into evidence, as were the three statements Trotter gave to law enforcement. Forensic pathologist Dr. Stephen Hayne testified that the cause of Hill’s death was a gunshot wound to the chest which penetrated the left lung, and the manner of death was homicide. Additional testimony was taken regarding the murder weapon. Trotter’s
 
 former
 
 girlfriend, Latoya Cooks, testified that she had originally bought the .380 handgun at a pawnshop. She was going to sell it to Trotter’s aunt days before the murder, but she gave it to Trotter instead. She testified that she never saw the handgun again. Later, it was found to be the same handgun recovered from Trotter’s Cadillac. A forensic firearms expert testified that after completing a microscopic-comparison examination between a test bullet fired from the handgun found in Trotter’s Cadillac and the bullet retrieved from Hill’s body, he was of the opinion the bullets were fired from the same weapon.
 

 ¶ 7. Trotter was the only witness to testify in his defense. He maintained his statements to law enforcement were voluntary and “the truth.” Trotter admitted he drove his Cadillac on June 12 and took Pittman to Hill’s house at Pittman’s urging to get the money for the marijuana. Trotter maintained he did not “have anything against” Hill and did not know Pittman intended to shoot Hill that evening. As for Trotter’s use of the name “Cliff’ to get Hill to open the door, Trotter explained he was just joking with Hill and was not trying to conceal his identity, as the prosecution suggested. Trotter confirmed that the handgun used in the slaying belonged to him, that he had received it from his former girlfriend, Cooks, and that he kept it under the seat of his Cadillac. However, Trotter did not know Pittman had the handgun in his vehicle the evening of the murder. Finally, Trotter insisted he did not shoot Hill.
 

 ¶8. After the defense rested, the jury received numerous instructions on the law, including instructions for the crimes of aiding and abetting, murder, and manslaughter. The jury found Trotter guilty of murder as charged, and he was sentenced to life imprisonment. After trial, Trotter filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which was denied. Trotter now appeals, raising several issues, which we shall discuss in turn.
 

 ANALYSIS OF THE ISSUES
 

 1. Whether the circuit court erred in admitting into evidence the victim’s statement as a dying declaration.
 

 ¶ 9. After the jury was empaneled, the defense moved ore tenus to ex-
 
 *407
 
 elude the hearsay testimony of Officer Grayson regarding Hill’s statements upon finding him shot in his doorway. Hill told Officer Grayson that “Pooh Man” shot him — “the guy who lives down the street ... drives the blue Cadillac, lives in that trailer.” The circuit court judge heard Officer Grayson’s proffered testimony and admitted it into evidence as a dying declaration exception to hearsay under Mississippi Rule of Evidence 804(b)(2). A dying declaration is made “by a declarant while believing that his death [is] imminent, concerning the cause or circumstances of what he believe[s] to be his impending death.” M.R.E. 804(b)(2). In order to determine whether a statement qualifies as a dying declaration, the Mississippi Supreme Court articulated the following three-prong test in
 
 Watts v. State,
 
 492 So.2d 1281 (Miss.1986): “1. The wounded person is in extremis and dies after making the statement, 2. The person realizes that he is mortally wounded, and 3. He has no hope of recovery.”
 
 Id.
 
 at 1287 (citing
 
 Fuson v. State,
 
 413 So.2d 734, 737 (Miss.1982);
 
 Clark v. State,
 
 398 So.2d 229, 230 (Miss.1981)). This Court’s standard of review regarding the admissibility of testimonial evidence is an abuse of discretion.
 
 Harris v. State,
 
 861 So.2d 1003, 1018(¶ 41) (Miss.2003). We leave such admissions to the sound discretion of the trial judge, and any error warrants reversal only when the abuse of discretion prejudices the accused.
 
 Id.
 

 ¶ 10. Trotter argues that no. evidence was introduced which proved Hill knew he was mortally wounded and had no hope of recovery; instead, testimony indicates Hill merely asked Officer Grayson for assistance. Trotter points to the fact that Hill never specifically said he was dying, and nobody else but Officer Grayson heard Hill’s comments. Trotter thus concludes that Hill’s statements should not have been admitted as a dying-declaration exception to the hearsay rule. We disagree.
 

 ¶ 11. The evidence in the record indicates Hill could have known of his impending death and that he had no hope of recovery even if not specifically expressed by him. The
 
 Watts
 
 court explained that the “knowledge of impending death may be inferred from the nature and extent of the wound inflicted upon the victim” without any expressed declaration of the victim to show “he was sensible of impending death.”
 
 Watts,
 
 492 So.2d at 1287-88 (quoting
 
 Clark,
 
 398 So.2cl at 230-31). When Officer Grayson found Hill lying in his doorway, Hill said to him: “Man, I need some help. I’m cold.” It could be inferred from the situation that Hill knew he had been shot and lying in his doorway, unable to rise, for a long period of time. Officer Grayson testified that Hill was going in and out of consciousness while speaking with him, and Hill specifically told him he could not move. In Officer Grayson’s proffered testimony, when he asked Hill where he had been shot, Hill moved his arm so Officer Grayson could then see the bullet wound in Hill’s upper left chest, near his heart. Hill never recovered from his injury and died thirteen days later. We find Hill’s consciousness of his own death can be reasonably inferred from the above facts; thus, his statement to Officer Grayson could be considered a dying declaration. Accordingly, we find that the circuit court did not err in admitting Officer Grayson’s testimony regarding the victim’s statement.
 

 2. Whether the circuit court erred in failing to declare a mistrial due to the prosecutor’s remarks during voir dire.
 

 ¶ 12. During voir dire, the following remarks were made to prospective ju
 
 *408
 
 rors by the prosecutor and defense counsel:
 

 Q. The charge in this case is murder. It’s not capital murder, and I just want to clear that up. There is a distinction. If someone were charged with the crime of capital murder, then a jury would have to determine not only guilt or innocence, but what sentence would be imposed. All right? Because the death penalty is a possibility in a capital murder trial. This is not a capital murder trial. The death penalty is not a possible sentence in this case. Murder is limited to a term of imprisonment....
 

 Defense counsel: Your Honor.... I don’t think this is proper voir dire examination on what the penalties would be. The jury will be instructed as to what them job is. The Court will give them the law on what their job is.
 

 And to give them any information about possible sentences as to any crime that may be charged I think would be improper at any stage of the trial, certainly at this early stage.
 

 The Court: Objection overruled.
 

 Q. [T]he purpose of this question is [to] make sure that everybody understands, first, what your job will be in this case, solely the determination of guilty or innocence, and that the sentence is up to the Court.... [T]he reason I ask this is because people have all kind of views about capital cases. I want to make sure that everybody understands that you’re not going to be asked to impose the death sentence, or any sentence for that matter. Does everybody understand that?
 

 ¶ 13. Trotter contends that the prosecutor’s remarks about sentencing so prejudiced him that he was denied the right to a fair trial, as the remarks focused the jury’s attention for the remainder of Trotter’s trial on sentencing, not the evidence of his guilt or innocence. The State argues that this issue is waived, as Trotter’s trial counsel did not request a new trial at the time of his objection and did not mention this issue in the motion for a JNOV or a new trial.
 

 ¶ 14. According to the record, while Trotter’s trial counsel did make a general objection to the prosecutor’s statements during voir dire, the State is correct in noting Trotter did not specifically request a new trial, nor did he request the judge to tell the jury to disregard the statements. Had the prosecutor’s comments been so prejudicial to Trotter to deny him a fair trial, we would not disregard them because a constitutional right is at issue. However, we find no such prejudice.
 

 ¶ 15. Trotter cites
 
 Marks v. State,
 
 532 So.2d 976 (Miss.1988) in support of his argument of prosecutorial misconduct that results in an unfair trial. In
 
 Marks,
 
 the Mississippi Supreme Court stated, “[w]e have consistently disapproved of arguments which refer to the potential sentence in a given case .... [t]he problem with arguments such as these is that they invite the jury to convict with regard to the punishment, not with regard to the evidence before them, and the jury should have no concern with the quantum of punishment to be imposed.”
 
 Id.
 
 at 983. The Mississippi Supreme Court continued that “condemnation of such arguments by prosecutors is our easiest task. The more formidable task is in deciding whether this improper argument rises to the level of reversible error.”
 
 Id.
 
 In the instant case, we find that the prosecution was merely advising the potential jurors that they would not be called upon to decide a death-penalty case. Any time jurors learn they will be hearing a case that involves “mur
 
 *409
 
 der,” they could have legitimate concerns about the possible imposition of the death penalty. In fact, we note that if Trotter’s case had been a death-penalty case, trial counsel would be exploring the jury’s ethical concerns extensively. We acknowledge that advising the jury whether or not a case involves the death penalty is more properly for the trial judge than for trial counsel. However, to the extent there may have been a violation of the supreme court’s holding in
 
 Marks,
 
 regarding the prosecutor’s remarks during voir dire, we find no prejudice to Trotter. The prosecutor made no effort to advise the jury as to the different sentences or number of years under each sentence for the crimes of murder or manslaughter — the two crimes the jury would be considering. This situation is distinguishable from
 
 Marks,
 
 where the prosecutor’s objectionable comments during closing argument compared the sentences of murder and manslaughter. In
 
 Marks,
 
 the prosecutor stated, “[a] manslaughter conviction will not penalize this defendant enough.... [H]e will get off. A murder conviction will punish him sufficiently. ...”
 
 Id.
 
 Accordingly, we find the trial court did not err in failing to declare a mistrial during voir dire.
 

 3. Whether the circuit court committed reversible error when it admitted Trotter’s two statements, regarding his involvement in the crime, into evidence.
 

 ¶ 16. On June 12, 2003, after Trotter was taken into custody, he was informed of and waived his
 
 Miranda
 
 rights. He gave two statements within an hour’s time regarding his involvement in the murder — the second containing more details than the first, and both were read to the jury at trial and admitted into evidence without objection. Trotter now argues that the circuit court committed reversible error in admitting his two statements, primarily because of the fact he was only seventeen years old at the time law enforcement questioned him on June 12. Trotter also claims his statements to law enforcement violate the Mississippi Youth Court Act because he was not informed that his mother had a right to be present.
 
 See
 
 Miss.Code Ann. § 43-21-303(3) (Rev. 2004). Further, Trotter argues his statements should have been suppressed because at the time he gave them, he had not been charged with a crime, nor had he been told he was even a suspect in a crime.
 

 ¶ 17. The standard of review for
 
 Miranda
 
 waivers is as follows:
 

 The prosecution has the burden of proving beyond a reasonable doubt that the confession was voluntary.
 
 Morgan v. State,
 
 681 So.2d 82, 86 (Miss.1996). This burden is met and a prima facie case established by the testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offers of reward.
 
 Dancer v. State,
 
 721 So.2d 583, 587 (Miss.1998) (holding the confession of a thirteen-year-old voluntary). Whether there was an intelligent, knowing and voluntary waiver is a factual question to be determined by a trial court from the totality of the circumstances.
 
 McGowan v. State,
 
 706 So.2d 231, 235 (Miss.1997). “This totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved .... ”
 
 Dancer,
 
 721 So.2d at 587 (quoting
 
 Fare v. Michael C.,
 
 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).
 

 Martin v. State,
 
 854 So.2d 1004, 1006-07(¶ 4) (Miss.2003). The
 
 Fare
 
 court goes on to state that “[t]he totality approach permits — indeed, it mandates — inquiry
 
 *410
 
 into all the circumstances surrounding the interrogation. This includes evaluation
 
 of
 
 the juvenile’s age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him.... ”
 
 Fare,
 
 442 U.S. at 725, 99 S.Ct. 2560.
 

 ¶ 18. As Trotter did not contemporaneously object to the admission of these statements into evidence at trial, he is proeedurally barred from any allegation of error on appeal.
 
 See Washington v. State,
 
 957 So.2d 426, 429(¶13) (Miss.Ct.App.2007) (holding failure to make a con temporaneous objection serves as waiver of any alleged error). “It is axiomatic that a litigant is required to make a timely objection.”
 
 Smith v. State,
 
 797 So.2d 854, 856(¶ 7) (Miss.2001). Notwithstanding the procedural bar, after examining the record, we find the prosecution met its burden of proving beyond a reasonable doubt that Trotter’s confession was properly obtained. Officers Grayson and David Pitch-ford, who were present on June 12 when Trotter was brought into the sheriffs department after his arrest, and when he gave his two statements recounting the circumstances of Hill’s murder, testified for the State that Trotter’s waiver was intelligent, knowing, and voluntary. Both officers stated Trotter was given, read, and signed a
 
 Miranda
 
 waiver of rights form, which was introduced into evidence. Additionally, the voluntary statement form on which Trotter’s handwritten statements appear also had a
 
 Miranda
 
 waiver printed on it. Further, Trotter never claimed his statements were coerced, threatened, or forced. Even at trial, Trotter maintained that his handwritten statements were “the truth” and were voluntarily given, obviously in the hope that he would not be convicted of murder because he claimed he was not the gunman. Regarding other
 
 Fare
 
 factors such as age, education, and intellect, Trotter was seventeen years old at the time of the waiver. Nothing in the record indicates he was below average in maturity for his age. Further, age is just one factor in the totality of the circumstances test and is not conclusive of an improper waiver of rights.
 
 See Woodham v. State,
 
 779 So.2d 158, 161-62 (¶¶ 13, 17) (Miss.2001) (sixteen-year-old’s confession considered voluntary);
 
 Moody v. State,
 
 838 So.2d 324, 333(¶ 32) (Miss.Ct.App.2002) (court deemed confession by fourteen-year-old voluntary). Trotter had just graduated from high school at the time of the incident and had planned to attend a community college, indicating he had the education to understand what he read and signed. Further, according to the record, Trotter’s own testimony at trial was articulate, showing his intellectual capacity to understand the waiver. Under the totality of the circumstances and the
 
 Fare
 
 standard of review for a minor’s waiver, the record shows there was substantial evidence Trotter understood his
 
 Miranda
 
 rights and the consequences of waiving those rights. We agree with the circuit court that his waiver was intelligent, knowing, and voluntary.
 

 ¶ 19. Regarding Trotter’s argument that he did not know he was a suspect, the record indicates he waived his rights and made the statements after he had been arrested by Officer Pitchford and had been taken into custody for questioning. We fail to see how Trotter could not have known he was a suspect, especially since he admitted he was at least present during the murder, with the only other eyewitness being Pittman.
 

 ¶ 20. Finally, Trotter claims that his statements should have been suppressed as they were obtained without the presence of a parent, in violation of the Mississippi Youth Court Act. While Trotter is
 
 correct
 
 that he had not been charged
 
 *411
 
 with a crime at the time of his questioning on June 12, our Court has held that once a minor becomes a suspect of a crime that carries a potential life sentence or death, such as murder, and it becomes necessary to detain him, inform him of his
 
 Miranda
 
 rights, and interrogate him, the minor is removed from the protection of the Youth Court Act pursuant to Mississippi Code Annotated section 43—21—151(l)(a) (Rev. 2004), and the circuit court has original jurisdiction.
 
 [3]
 

 Moody,
 
 838 So.2d at 334(¶ 34). Once Trotter had been arrested and brought to the sheriffs department, he was considered a suspect for Hill’s murder. We find this argument without merit.
 

 ¶ 21. Accordingly, we find the circuit court did not err in admitting Trotter’s two statements regarding his involvement in the murder.
 

 4. Whether Trotter’s trial counsel was ineffective.
 

 ¶ 22. Trotter asserts that he received ineffective assistance of counsel because: (1) Trotter was not arraigned, (2) there was inadequate investigation and preparation of the case for trial, (3) there was inadequate interviewing and usage of crucial witnesses at trial (including co-defendant Pittman), (4) defense counsel failed to object to the admission of Trotter’s statements to law enforcement, and (5) defense counsel failed to request a forensic expert to counter Dr. Hayne’s testimony. Trotter did not raise this issue before the trial court; he raises it for the first time on appeal.
 

 ¶ 23. Because there is usually insufficient evidence in the trial record and related matters to evaluate the claim, this Court has stated “[w]hen a party raises an ineffective assistance of counsel claim on direct appeal, the proper resolution is to deny relief without prejudice to the defendant’s right to assert the same claim in a post-conviction relief proceeding.”
 
 Graves v. State,
 
 914 So.2d 788, 798(¶ 35) (Miss.Ct. App.2005). This Court will reach the merits of an ineffective assistance claim only in instances where “(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.”
 
 Witcher v. State,
 
 863 So.2d 776, 825 (¶ 171) (Miss.2003) (citations omitted). Trotter claims that his trial counsel’s performance violated his Sixth Amendment right to counsel. However, we find no affirmative showing of ineffective assistance rising to constitutional dimensions within the record, and we find no related stipulation between the parties. Accordingly, we decline to address this issue, and dismiss it without prejudice. Trotter may raise this claim in post-conviction-relief proceedings.
 

 5. Whether cumulative errors denied Trotter a right to a fair trial.
 

 ¶24. Trotter contends that due to the numerous alleged legal errors he suffered at trial, he was denied the right to a fair trial. It is well established that this Court has the discretion to determine in a case where individual errors, which are not reversible in themselves, when considered cumulatively may warrant reversal based
 
 *412
 
 upon cumulative prejudicial effect.
 
 Byrom v. State,
 
 863 So.2d 836, 847(¶ 13) (Miss. 2003). The issue becomes “whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial.”
 
 Gibson v. State,
 
 731 So.2d 1087, 1098(¶ 31) (Miss.1998). After examining the record, we find no errors that so prejudiced Trotter as to have denied him a fundamentally fair trial.
 

 6. Whether Trotter’s sentence constitutes cruel and unusual punishment.
 

 ¶ 25. After the jury found Trotter guilty of murder, the circuit court judge sentenced him to life imprisonment. Trotter notes that co-defendant Pittman was only sentenced to twenty years for a conviction of manslaughter, and based on the evidence presented at trial, the jury could not have definitively determined that Trotter was the gunman. Therefore, Trotter argues his sentence, in comparison to Pittman’s, violates the Eight Amendment’s prohibition against cruel and unusual punishment.
 

 ¶ 26. “It is well established that [the appellate court] will not disturb a sentence where it does not exceed the maximum period allowed by statute.”
 
 Ford v. State,
 
 975 So.2d 859, 869(¶39) (Miss.2008) (citing
 
 Williams v. State,
 
 794 So.2d 181, 188(¶ 30) (Miss.2001)). However, if a sentence is grossly disproportionate to the crime committed, it may be reviewed on Eighth Amendment grounds.
 
 Id.
 

 ¶ 27. In Trotter’s case, the jury was instructed on the crimes of murder and manslaughter. Additionally, the jury was instructed that if it found beyond a reasonable doubt that someone other than Trotter committed the murder, but Trotter “either directed or aid[ed] and abett[ed] that person” during the murder, it should find Trotter guilty of murder. Therefore the jury could have properly found Trotter guilty of murder without Trotter’s actually having fired the shot that killed Hill. Furthermore, Trotter’s sentence does not exceed the statutory maximum; the only available punishment for murder is life in prison pursuant to Mississippi Code Annotated section 97-3-21 (Rev.2006).
 
 [4]
 

 ¶ 28. Trotter cites
 
 Davis v. State,
 
 724 So.2d 342 (Miss.1998) to argue that his case should be remanded for resentencing. In
 
 Davis,
 
 the first-time offender was convicted of selling two rocks of crack cocaine and sentenced to the maximum term of thirty years, which was doubled because Davis sold the cocaine within 1,500 feet of a church.
 
 Id.
 
 at 343 (¶¶ 4-5). The court vacated Davis’s sentence because there was nothing in the record to justify the imposition of the maximum sentences.
 
 Id.
 
 at 344-45 (¶¶ 10-11). Trotter’s case is distinguishable. The sentence of life imprisonment is the only option the circuit court judge had once the jury convicted Trotter of murder; there is no matter of judicial discretion as in
 
 Davis.
 

 ¶ 29. For the foregoing reasons, we find Trotter’s sentence does not constitute cruel and unusual punishment.
 

 CONCLUSION
 

 ¶ 30. Based on the foregoing, we conclude Trotter’s assignments of error are without merit. We therefore affirm his conviction of murder and sentence of life imprisonment.
 

 ¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF HUMPHREYS
 
 *413
 
 COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . Officer Grayson testified he knew Trotter "very well” as Trotter is his stepfather’s cousin.
 

 [2]
 

 . Trotter also gave a third handwritten statement the next day, June 13, which was entered into evidence, regarding two guns he had received from his aunt. During trial, he admitted this third statement was voluntary as well.
 

 [3]
 

 . Section 43—21—151 (l)(a.) of the Youth Court Act states the youth court shall have exclusive original jurisdiction in all proceedings concerning a child, which is defined as a person who has not reached his or her eighteenth birthday, except when the child attempts or commits an act which, if committed by an adult, would be punishable under state or federal law by life imprisonment or death; then the circuit court will have original jurisdiction.
 

 [4]
 

 . This statute states a person convicted of murder shall be sentenced to imprisonment for life in the State Penitentiary. Miss.Code Ann. § 97-3-21.