LEE, P.J., for the Court:
 

 PROCEDURAL HISTORY
 

 ¶ 1. A jury in the Warren County Circuit Court convicted Quintín Williams a/k/a Quintín Lamar Williams of Count I, armed robbery; Count II, kidnapping; Count III, kidnapping; and Count IV, felon in possession of a weapon. Williams was sentenced to twenty-five years in Count I; thirty years in Count II; thirty years in Count III; three years in Count IV; and ten years pursuant to Mississippi Code Annotated section 97-37-37(2) (Supp.2009), with the sentences to run consecutively in the custody of the Mississippi Department of Corrections. Williams subsequently filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The trial court denied the post-trial motion.
 

 ¶ 2. Williams now appeals, asserting the following issues: (1) the trial court erred in denying his motion to suppress the pretrial identification; (2) the trial court erred in failing to provide the jury with all of the exhibits and improperly addressed the jury; and (3) the jury’s verdict was not supported by sufficient evidence and is against the overwhelming weight of the evidence. Finding no reversible error, we affirm.
 

 FACTS
 

 ¶ 3. On March 31, 2007, Madaliso Har-grove, who was six-months pregnant, was placing something on the passenger seat of her car when she was struck on the back of the head with a gun. Hargrove’s three-year-old son was already in the car. The assailant, who was a black male, pointed a gun at Hargrove and demanded money. Prior to this attack, Hargrove had noticed this man acting suspiciously in the parking lot of her apartment complex in Vicksburg, Mississippi. Hargrove, who was bleeding from the head, handed her purse to the man. The man forced Hargrove into the car and ordered her to drive him to another location. Hargrove got behind the wheel, and the assailant sat on the back seat next to Hargrove’s son, directly behind Hargrove. Hargrove testified that she was able to see her assailant clearly through the rear view mirror. At one point, Hargrove’s son began to cry, and the assailant pointed his gun at the boy and told him to “shut up.” The assailant directed Hargrove to drive to a nearby ball field, forced her to stop the car, and fled the scene.
 

 ¶ 4. Hargrove was able to get help from a passerby, and the Vicksburg Police Department was notified. Officer Jeff Merritt met Hargrove at the hospital, but Har-grove was unable to give a statement at that time. Two days later, as Hargrove was leaving her apartment complex, she saw her attacker in the parking lot with two other men. Hargrove, who did not
 
 *633
 
 have a cell phone, drove to the police department to report the incident. Police were dispatched to the apartment complex, but Hargrove’s attacker was no longer present.
 

 ¶ 5. A few days later, on April 5, Har-grove gave a statement to Officer Merritt in which she described her attacker as a young, black male, with a dark complexion, who was short, slim, approximately five-feet six-inches tall, and weighed between 110 and 120 pounds.
 

 ¶ 6. On April 10, Hargrove saw her attacker again in the parking lot of her apartment complex with two men. Har-grove notified Officer Merritt, but by the time Officer Merritt responded, only two men were in the area specified by Har-grove. Officer Merritt questioned the two men, one of whom identified the third man who had been with them as a man named “Little Edward.” One of the men indicated that “Little Edward” lived in the neighborhood, but neither man claimed to know “Little Edward” well. Officer Merritt searched for the name “Little Edward” in the police database, but he found no name under that particular alias. The next day Officer Merritt received an anonymous tip that the person responsible for the armed robbery and kidnapping, as well as other armed robberies in the area, was known as “Little Quintín.” Officer Merritt searched for “Little Quintín” in the database, and the name Quintín Williams was returned. Williams’s address was in the vicinity of Hargrove’s apartment complex.
 

 ¶ 7. The only photograph of Williams in the database was a side-profile photograph. On April 15, Hargrove, after viewing this side-profile photograph, immediately recognized Williams as her attacker. The profile photograph also contained information about Williams on the bottom, such as his sex, race, weight, height, and date of birth. Hargrove testified that she only looked at Williams’s face and not at the information on the bottom of the photograph. Hargrove’s earlier description of Williams was similar to that on his profile photograph.
 

 ¶ 8. Officer Merritt attempted to find Williams for several months, but he was unsuccessful. In September 2007, Williams was arrested on an unrelated charge. His photograph was placed in a six-pack photographic lineup for Hargrove to view. Hargrove immediately identified Williams as her attacker. Hargrove also identified Williams in open court as her attacker.
 

 DISCUSSION
 

 I. MOTION TO SUPPRESS
 

 ¶ 9. In his first issue on appeal, Williams argues that the trial court erred in denying his motion to suppress Har-grove’s pretrial identification. The standard of review for suppression-hearing findings in pretrial-identification cases is whether or not substantial credible evidence supports the trial court’s findings that, considering the totality of the circumstances, the in-court identification testimony was not impermissibly tainted.
 
 Ray v. State,
 
 503 So.2d 222, 223-24 (Miss.1986).
 

 ¶ 10. Williams contends that Har-grove’s identification of Williams in the six-pack photographic lineup was based upon her identification of Williams from the alleged highly-suggestive side-profile photograph and not on her personal observations. We have recognized that showing a witness a single photograph of a defendant could be impermissibly suggestive.
 
 Moore v. State,
 
 909 So.2d 77, 85 (¶ 29) (Miss.Ct. App.2005). However, an impermissibly-suggestive pretrial identification does not preclude in-court identification unless “from the totality of the circumstances ... the identification was so impermissibly
 
 *634
 
 suggestive as to give rise to a very substantial likelihood of irreparable misidenti-fication.”
 
 York v. State,
 
 418 So.2d 1872, 1378 (Miss.1982).
 

 ¶ 11. In assessing the validity of identification testimony, we look to the five factors from
 
 Neil v. Biggers,
 
 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). These factors were adopted by our supreme court in
 
 York,
 
 and they are as follows: (1) “the opportunity of the witness to view the criminal at the time of the crime”; (2) “the witnesses] degree of attention”; (3) “the accuracy of the witnesses] prior description of the criminal”; (4) “the level of certainty demonstrated by the witness at the confrontation”; and (5) “the length of time between the crime and the confrontation.”
 
 York,
 
 413 So.2d at 1383.
 

 ¶ 12. Hargrove had ample opportunity to view Williams at the time of the crime. Hargrove testified that she noticed Williams prior to the commission of the crime. Hargrove, who had lived in that apartment complex for nine months, had never seen Williams before, and she thought he looked suspicious. Williams was wearing a hood when he first approached Hargrove, but it eventually fell down during the physical attack. Har-grove testified that she was face-to-face with Williams when he was demanding money from her. Hargrove further testified that she was able to view Williams clearly in the rear view mirror when she was driving him away from the apartment complex. Hargrove stated that she was in close proximity to Williams for the entire encounter, and at one point, their bodies touched.
 

 ¶ 13. From Hargrove’s testimony, it is clear that she paid a great deal of attention to Williams. Although Hargrove stated that she was dizzy after being struck on the back of the head by Williams, she was able to give a detailed description of Williams to the police. Hargrove was able to remember what Williams smelled like. Hargrove was six-months pregnant at the time of the robbery, and her three-year-old son was with her. Hargrove stated that she exited the car at the ball field so her son would not be able to see in case Williams shot her. Williams raises concerns about Hargrove’s description being so similar to that listed on the bottom of the side-profile photograph; however, we note that Hargrove gave a detailed description of Williams six days prior to seeing the side-profile photograph. Har-grove’s description of Williams without seeing the photograph matched the description on the photograph. Williams also contends that Hargrove was not confident in her identification of Williams from the six-pack because she asked to see the side-profile photograph of Williams. However, Hargrove immediately picked Williams out of the six-pack photographic lineup. She testified that she also wanted to see the side-profile photograph because Williams’s hair was styled differently in the photograph in the six-pack photographic lineup. Williams’s hair was braided in the six-pack photograph, but it was not braided in the side-profile photograph. We note that all the photographs in the six-pack were of men with braided hair.
 

 ¶ 14. Hargrove’s prior description of Williams was accurate. Hargrove’s description of Williams was only off by one inch and five pounds. Hargrove also saw Williams twice at the apartment complex, one time before her statement to the police and one time a few days after giving her statement. Williams claims that Har-grove’s sightings of him were never substantiated; however, there is nothing in the record to indicate that Hargrove was lying or mistaken in her belief.
 

 
 *635
 
 ¶ 15. Throughout the case, including pretrial identification, Hargrove never wavered in her identification of Williams as her attacker. Hargrove gave a detailed description of Williams, identified Williams from two photographs without hesitating, and positively identified him during trial more than once. Hargrove testified that: “You can never forget a face like that.” Williams attempts to miseharacterize Har-grove’s testimony by pointing out discrepancies in her story, such as whether Har-grove handed Williams her purse or whether Williams grabbed it from the passenger seat. However, none of these purported discrepancies relate to Hargrove’s description of Williams.
 

 ¶ 16. Regarding the length of time between the crime and the confrontation, Hargrove first identified Williams two weeks after her attack, then giving a detailed description of Williams, and then after seeing him twice after the robbery and kidnapping. Hargrove again identified Williams six months later during the six-pack photographic lineup. Hargrove also positively identified Williams during trial, which occurred approximately one year after the crime.
 

 ¶ 17. Although a single photographic lineup could be impermissibly suggestive, the record indicates that the six-pack photographic lineup was not impermissibly suggestive. Furthermore, there is substantial credible evidence supporting the trial court’s ruling that there was not a substantial likelihood of irreparable mis-identifieation. This issue is without merit.
 

 II. JURY
 

 ¶ 18. In his second issue on appeal, Williams argues that the trial court erred in failing to provide the jury with all the exhibits.
 

 ¶ 19. During deliberations, the jury sent the trial judge a note, which stated: “We would like to see the six-pack of pictures.” The trial judge informed the State and Williams that he sent the jurors two exhibits with a note attached which stated: “These two exhibits should have been sent to you.” Neither side objected. During the hearing on the motion for a new trial, the parties discussed the fact that the trial judge neglected to send the side-profile photograph to the jury. Williams contends that the failure to send the side-profile photograph to the jury constituted reversible error. Williams cites to
 
 Pettit v. State,
 
 569 So.2d 678 (Miss. 1990) and
 
 White v. State,
 
 732 So.2d 961 (Miss.1999) in support of his argument. In
 
 Pettit,
 
 the trial court refused to let the jury listen to an audiotape of a drug transaction during deliberations.
 
 Pettit,
 
 569 So.2d at 680. The supreme court found this refusal by the trial court to be error, but it found such error harmless because the recording was of poor quality; the jury had heard the audiotape once in its entirety; and the jury heard certain parts a second time.
 
 Id.
 
 In
 
 White,
 
 the supreme court reversed and remanded Anita White’s conviction because in refusing to allow the jury to replay an audiotape during deliberations, the trial court misstated the law in front of the jury.
 
 White,
 
 732 So.2d at 965 (¶¶ 16-17). The supreme court found that White’s defense of mistaken identity was impaired once the jury was not allowed to listen to the audiotape during deliberations.
 
 Id.
 
 at 967 (¶ 31).
 

 ¶ 20. Williams’s situation is distinguishable from both
 
 Pettit
 
 and
 
 White.
 
 The trial judge did not misstate the law or refuse to send the side-profile photograph to the jury; instead, the trial judge inadvertently forgot to send the side-profile photograph of Williams along with the six-pack photographic lineup. In addition to viewing the side-profile photograph of Williams several times during the trial, the photograph was
 
 *636
 
 handed to each individual juror to examine. Furthermore, in
 
 White,
 
 the defendant was attempting to prove that it was not his voice on the audiotape.
 
 Id.
 
 at 964. Williams was not arguing that the photograph was of someone else as the photograph was clearly of Williams. We agree with the trial judge’s determination that inadvertently withholding the side-profile photograph of Williams was error, but that error was harmless.
 

 ¶ 21. Williams also contends that the trial court improperly addressed the jury, violating the parameters set out in
 
 Sharplin v. State,
 
 330 So.2d 591 (Miss. 1976). After approximately one-and-a-half hours of deliberation, the foreman of the jury told the trial judge that the jury was hung at ten to two, without indicating which way their votes were split. The trial judge asked both the State and Williams if they agreed for him to give them the
 
 Sharplin
 
 charge. Both the State and Williams consented. The trial judge brought the jury in and read the appropriate language as provided in
 
 Sharplin. Id.
 
 at 596. Williams contends that the trial judge’s additional commentary, namely that the trial judge recognized that the verdict was split ten to two, was reversible error as its purpose was to pressure the two votes.
 

 ¶ 22. We first note that Williams failed to contemporaneously object and failed to raise this issue in his motion for a new trial; thus, he has waived this issue for purposes of appellate review.
 
 Ahmad v. State,
 
 603 So.2d 843, 846-47 (Miss.1992). Regardless of Williams’s waiver of this issue, we find no error committed by the trial judge. As made clear in
 
 Sharplin,
 
 the trial judge’s knowledge of the numerical division is not error; instead, an appellate court should consider “the trial judge’s conduct and comments after he receives the division, that is, whether the judge merely affords the jury additional time to deliberate or [wjhether he attempts to force a verdict by suggestive comments or coercive measures.”
 
 Sharplin,
 
 330 So.2d at 596. The trial judge’s comment about the numerical split was not coercive, but simply a statement of fact. This issue is without merit.
 

 III. LEGAL SUFFICIENCY AND OVERWHELMING WEIGHT OF THE EVIDENCE
 

 ¶ 23. In his final issue on appeal, Williams argues that the evidence was insufficient to support a guilty verdict, and the verdict is against the overwhelming weight of the evidence. We will discuss each separately.
 

 A. Legal Sufficiency of the Evidence
 

 ¶ 24. In order for this Court to uphold the denial of a motion for a JNOV, the evidence must show “beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.”
 
 Bush v. State,
 
 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting
 
 Carr v. State, 208
 
 So.2d 886,
 
 889
 
 (Miss. 1968)). If the facts and inferences “ ‘point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,’ the proper remedy is for the appellate court to reverse and render.”
 
 Id.
 
 (quoting
 
 Edwards v. State,
 
 469 So.2d 68, 70 (Miss.1985)).
 

 ¶ 25. Mississippi Code Annotated section 97-3-79 (Rev.2006) defines armed robbery as:
 

 Every person who shall feloniously take or attempt to take from the person or
 
 *637
 
 from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery....
 

 Williams contends that the evidence was legally insufficient to convict him of armed robbery because the evidence failed to support that Williams took Hargrove’s property “from the person or from the presence.” Whether Hargrove handed Williams her purse or whether Hargrove told Williams to get it himself from the passenger seat is not the point. The point is that Williams pointed a gun at Hargrove and demanded money, which he ultimately got. This issue is without merit.
 

 B. Weight of the Evidence
 

 ¶ 26. “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844 (¶ 18). When reviewing the weight of the evidence, this Court sits as a “thirteenth juror.”
 
 Id.
 

 ¶ 27. Much of Williams’s argument consists of attacking the quality of the police work performed by the Vicksburg Police Department. We find no merit to these arguments. The rest of Williams’s argument consists of minor inconsistencies in Hargrove’s statements. Hargrove consistently identified Williams as her attacker, and the uncorroborated testimony of a single witness is enough to support a guilty verdict.
 
 See Cousar v. State,
 
 855 So.2d 993, 998-99 (¶ 16) (Miss.2003). This issue is without merit.
 

 ¶ 28. THE JUDGMENT OF THE WARREN COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, ARMED ROBBERY, AND SENTENCE OF TWENTY-FIVE YEARS; COUNT II, KIDNAPPING, AND SENTENCE OF THIRTY YEARS; COUNT III, KIDNAPPING, AND SENTENCE OF THIRTY YEARS; AND COUNT IV, FELON IN POSSESSION OF A FIREARM, AND SENTENCE OF THREE YEARS; AND SENTENCE OF TEN YEARS PURSUANT TO MISSISSIPPI CODE ANNOTATED SECTION 97-37-37, WITH THE SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WARREN COUNTY.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR.