BARNES, J.,
for the Court:
¶ 1. After a trial in the Marion County Circuit Court, a jury found Joshua Moore guilty of conspiracy to commit armed robbery, six counts of armed robbery, and manslaughter. Moore was sentenced to five years for the conspiracy charge, twenty years for each armed-robbery charges, and twenty years for the manslaughter charge, all in the custody of the Mississippi Department of Corrections (MDOC), with the conspiracy, one armed-robbery count, and manslaughter charge to run consecutively to each other, and the other charges to run concurrently with the one armed-robbery count for a total of forty-five years to serve. Moore now appeals, arguing that the trial court should have declared a mistrial on two occasions: when the court discovered that two admitted exhibits were not given to the jury during deliberations, and when the prosecution elicited hearsay testimony regarding what the decedent stated after being shot. Additionally, Moore argues that the evidence is insufficient to support a conviction for the armed robbery of Ernest Ratliff. Finding no reversible error, we affirm.
STATEMENT OF THE FACTS AND PROCEDURAL HISTORY
¶ 2. On the evening of March 18, 2007, Leon Andrews had approximately twelve individuals at his home to shoot dice in Columbia, Mississippi. The gamblers were in the game room, which was a separate building from Andrews’s house. At approximately 10:15 p.m., two men with dark stockings over their heads burst into the game room. One of the men said “stop playing,” raised a gun, and fired it. Everyone was ordered to get on the floor. The two men demanded everyone’s money or they would kill someone. The gamblers put their money on or near a pool table in the room. At least two other shots were fired during the robbery. Before leaving, the two robbers forced the gamblers to remove their clothes. Once the robbers *1149 left, most of the gamblers quickly exited the game room, leaving through the window or door. At some point during the robbery, Flowers was shot; later he was pronounced dead at the hospital. Several individuals at the dice game identified the two robbers as Moore and Carlos Varnado.
¶ 3. Law-enforcement investigators located the two suspects. Search warrants were secured for Moore’s residence, where Moore and Varnado had been prior to their arrest. A .22 revolver, a .40-caliber pistol, clothing items, and a black hose-type head covering were recovered from the residence. Later, a second search warrant was issued for the same address, where a .380 pistol, which was located buried in the yard, was recovered. The investigators also found in the woods nearby some clothing that had been taken during the robbery and Andrews’s cellular telephone.
¶4. At trial, several individuals at the dice game testified for the State. Andrews testified that one of the two robbers was heavy-set and wore a brown stocking over his head. He had a small non-black handgun, which he shot three times. One of the men also took a little cash and Andrews’s cellular telephone when it started ringing during the robbery. After the incident had occurred and all the gamblers left the game room, Andrews went right back into the building and saw Flowers lying on the floor; Flowers’s brother, David Holmes, was holding Flowers. Andrews, however, could not say who had shot Flowers. Andrews also testified that after the robbers left the game room, he heard another individual “out there shooting” several times.
¶ 5. Brandon Grindle testified he could identify the robbers as Moore and Varna-do. Grindle claimed he recognized Moore from his size, and he could see through the brown stocking that Moore wore over his face. He also recognized Moore’s braids in his hair, and Moore’s accent was different than a Marion County accent. During the robbery, both robbers were aggressive, with Moore more aggressive than Varna-do; however, Varnado fired the first shot. Moore had a chrome .380 handgun, and Varnado had an automatic revolver. Grin-dle claimed they ordered everybody to “get down,” took their money, and then acted as if they were going to leave while constantly firing shots. Then they ordered every one to remove their clothing. Grindle noted that Chris Thompson, or “Black,” who was at the dice game, never took off his clothes or put any money on the pool table. Grindle did not know Flowers was shot until “it was all said and done”; then he heard Flowers say he had been shot. Grindle testified that after the robbers left and as the gamblers were exiting the building, an individual named Steven Buckley fired several shots.
¶ 6. Ratliff could also identify the robbers as Moore and Varnado, because he could see their faces through the stockings. Moore was heavy-set. He testified that the robbers did not make any threats while they were in the building, only “trash talking.” He claims three shots were fired during the robbery. He noted that nothing was taken from him, because he had lost all his money in the dice game. Ratliff testified that after he escaped through a window, he heard Holmes “hollering about his brother being shot”; so he and a few of the gamblers went back in to the game room to investigate the situation until law enforcement arrived.
¶ 7. During Holmes’s direct examination by the State, he testified that during the incident, but after several shots had been fired and everybody had gotten down on the floor, Flowers told him: “One of those boys just shot me.” Defense counsel promptly moved for a mistrial because the *1150 deceased Flowers could not be cross-examined. The trial judge denied the motion.
¶ 8. Dr. Steven Hayne testified for the State as an expert in forensic pathology. During Flowers’s autopsy, one bullet was recovered from his right chest cavity. There was one entry point for the gunshot wound in the left flank and no exit point. No powder residue was found on the wound track itself, which would indicate this was not a contact gunshot wound. The bullet traveled through Flowers’s stomach, diaphragm, left lung, and heart. The bullet was recovered from Flowers’s right lung. Dr. Hayne estimated Flowers probably would have lived a few minutes after having been shot, but his death would have been relatively quick. Flowers bled to death internally, with one-half of his blood found in different cavities of his body. Additionally, a photograph of Flowers’s head, which was taken before the autopsy, was entered into evidence (Exhibit 28), over the defense counsel’s objection, during Dr. Hayne’s testimony.
¶ 9. Carl Fullilove with the Mississippi Crime Laboratory was qualified as an expert for the State in the areas of firearms and tool-mark identification. He performed tests and comparisons on the three .380-shell casings that were collected from the game room floor and the .380 handgun which was found buried under a tree at Moore’s residence. Fullilove could neither confirm nor deny that the shell casings were fired by the .380 handgun which was recovered. However, Fullilove compared the projectile recovered from Flowers’s body with the .380 handgun and concluded that the projectile was fired by the .380 handgun found at Moore’s residence.
¶ 10. An eighteen-minute-long videotaped interview of Moore, taken on March 19, 2007, by law enforcement, was also entered into evidence. Moore is shown wearing braids and beads in his hair during the interview. Moore stated that the entire robbery was Black’s idea. He stated he fired his gun three times, but he did not admit that he had shot Flowers. He claimed he fired twice at the ceiling, and he fired a third time as he was running out of the building after the robbery, fleeing the premises. However, he was not sure where the third shot landed. He was unaware anyone had been shot until Black later told him. He also admitted that after the incident, he buried his gun under a tree upon returning to his residence.
¶ 11. After the State had rested its case-in-chief, a document was entered into evidence (Exhibit 31) by way of an agreement between the prosecution and the defense. It was a written statement by Investigator Anne Mitchell with the Marion County Sheriffs Department stating that she had received an anonymous call on February 1, 2008. The statement reads as follows:
I[,] Anne Mitchell[,] received a call from a black male stating he wanted to report a murder. Caller stated that he could not give his name or phone number and could not meet me anywhere to talk for fear of his own life. He stated to me that the victim was Lorenzo Flowers and the murder happened March 18, 2007. He then told me that “Munt” is the one that shot Flowers but does not know his real name. He stated that “Munt” is Flowers oldest brother.[1] He then told me he couldn’t talk but would call me back, then hung up.
This statement was the only piece of evidence admitted during the defense’s casein-chief. The statement was referred to by both the State and the defense during their closing arguments.
*1151 ¶ 12. The jury found Moore guilty of one count of conspiracy to commit armed robbery and six counts of armed robbery. While Moore had been indicted for capital murder, the jury found him guilty only of manslaughter, a lesser-included offense of capital murder. The jury could not unanimously agree to a sentence of life for the counts of armed robbery.
¶ 13. After the jury was dismissed and had vacated the courtroom, it came to the attention of the trial court that two exhibits (out of a total of thirty-one exhibits) had not been sent to the jury room for the jury’s consideration: Exhibits 28 and 31— the photograph of the decedent and the statement by Investigator Mitchell, respectively. The trial court, noting that the jury had not ever requested these two exhibits, stated that the error would not have altered the verdict; thus, it was ruled harmless error. Defense counsel objected and moved for a mistrial. After Moore was found guilty, his motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, claimed that the omission of Exhibit 31 from the jury’s deliberations was highly prejudicial to his defense; therefore, he should receive a new trial. The trial court denied the motion, and Moore timely appealed.
ANALYSIS
1. Trial Exhibits
¶ 14. Moore argues that the trial court erred in not declaring a mistrial when it was discovered that during deliberations, the jury had not been provided two exhibits — the photograph of the decedent Flowers (Exhibit 28) and the statement by Investigator Mitchell (Exhibit 31) — both of which had been admitted into evidence. Moore claims he was prejudiced, and the trial court’s error resulted in a defective verdict; therefore, he is entitled to a new trial.
¶ 15. Mississippi statutory law and court rules address exhibits and jury deliberations. Mississippi Code Annotated section 99-17-37 (Rev.2007) provides that “[a]ll papers read in evidence ... may be carried from the bar by the jury.” Likewise, Rule 3.10 of the Uniform Rules of Circuit and County Court states: “The court shall permit the jury, upon retiring for deliberation, to take to the jury room the instructions and exhibits and writings which have been received in evidence.... ” Rule 3.10 has been held “within reason, mandatory.” Pettit v. State, 569 So.2d 678, 680 (Miss.1990). However, on appeal an error of this sort may be deemed harmless, as in Pettit and Williams v. State, 40 So.3d 630 (Miss.Ct.App.2010).
¶ 16. In Pettit, the trial court did not allow the jury to take the State’s exhibit, a tape recording of a drug transaction, back to the jury room during deliberations. However, the error was found harmless because the exhibit was of poor quality, and the jury had already heard it once in its entirety and parts of the tape a second time. Pettit, 569 So.2d at 680.
¶ 17. During deliberations in Williams, the jury sent the trial judge a note requesting the photographic “six-pack” lineup that had included the defendant and which had been entered into evidence. Williams, 40 So.3d at 635 (¶ 19). The victim had identified her attacker from this lineup after the attacker had been arrested on an unrelated charge several months after her attack. Id. at 633 (¶ 7). The trial judge informed the State and the defense that he had sent the jury two exhibits with a note attached stating that the exhibits should have been sent to them. Neither party objected until a post-trial hearing, when it was discussed that the trial judge never sent to the jury a side-profile photograph of the defendant, *1152 which should have been with the six-pack photographic lineup. Id. at 635 (¶ 19). The victim had initially identified the defendant shortly after the attack by this side-profile photograph, which was in a database. Id. at 638 (¶ 7). The defendant argued the omission was reversible error, but this Court disagreed, finding the error harmless. Id. at 635-36 (¶¶ 19-20).
¶ 18. Here, there is no dispute that the failure to transfer the two exhibits from the courtroom to the jury-deliberation room was inadvertent, as in Williams, and that the jury was not able to consider them during its deliberations. Because the photograph of the decedent Flowers was entered into evidence for the identification of Flowers during the forensic pathologist’s testimony, we find this exclusion harmless error. It did not prejudice Moore’s defense.
¶ 19. The inadvertent exclusion to the jury deliberations of the statement by Investigator Mitchell is harmless as well. The substance of the statement was that Investigator Mitchell had received a call from an anonymous source indicating that Moore did not shoot the decedent; rather, “Munt” did. While the statement is hearsay, it was entered by way of an agreement between the State and the defense after the State had rested its case-in-chief. The State stipulated that if Investigator Mitchell were to testify, she would say what was contained in the exhibit. However, the State stressed it was not stipulating that the contents of the report were valid. The defense explained that they were admitting the document “[f]or what it’s worth.” During closing arguments, both the State and the defense referred to the statement and its contents. The prosecutor stated:
There is a statement in here from Anne Mitchell, who is a detective. It has no relevance to the case. It’s connected somewhat. The statement says, on this certain day, I got an anonymous phone call. An anonymous phone call? We’re letting evidence come in about an anonymous phone call? The guy said, I can’t come in and tell you, because I might get killed over it. It wasn’t Joshua Moore. It was Munt. Munt is a nickname for David Holmes. And that’s in evidence, because the defense wanted it in evidence.
Defense counsel responded:
[The prosecutor] brought up a piece of evidence that was tendered in the investigative part of this written by a lady named Anne Mitchell. At least it was signed by her. And it says that she got an anonymous call from a man in February of 2008 ... that someone else was involved in this shooting....
Now, I will readily admit they don’t say that — I believe that [the prosecutor] said Munt. They don’t say that he intentionally shot him. I wasn’t there. I don’t know. I’d like to know. He can’t help it if it’s an accident, okay? But somebody should have followed up on that ... somebody should have gone to Mr. Holmes .... and said ... we all understand that in the fray if something happens. We understand, but somebody should have done that a year and seven months ago, or however long it’s been; they didn’t.
I’m not going to read the letter to you, but the document speaks for itself, okay? And nobody is accusing Mr. Holmes of anything, but somebody should have followed up and said, hey, it was an accident or whatever happened. We needed that question answered.
(Emphasis added). Based upon Pettit, Williams, and strength of the prosecution’s case, we find it harmless error for Investigator Mitchell’s statement to be in *1153 advertently excluded from jury deliberations. The .380 handgun buried in Moore’s yard was undisputably his, and the evidence proved the bullet, which was retrieved from Flowers’s body, was fired from the .380 handgun found in Moore’s yard. The defense offered no explanation of how, if “Munt” killed Flowers as stated by the anonymous caller, “Munt” did it with the gun Moore admitted he had buried under the tree in his own yard. Defense counsel did not even argue at trial that the anonymous caller’s information was a truthful statement, but merely that it should have been investigated. Obviously, this statement was considered very weak evidence by the defense. Thus, Moore’s defense cannot be considered prejudiced by the inadvertent exclusion of this statement from the jury-deliberation room. Its exclusion was harmless error. This issue does not merit reversal.
2. Dying Declaration
¶ 20. Moore argues that the trial court erroneously denied his motion for a mistrial after the State elicited hearsay testimony from Holmes. We note the defense did not specifically object to the statement as hearsay until this appeal. During Holmes’s direct examination, when he was testifying as to what occurred during the armed robbery, he stated that everybody got down on the floor, and Flowers told him “[o]ne of those boys[2] just shot me.” Defense counsel promptly moved for a mistrial because he could not cross-examine the victim to determine which “boy”— Moore or Varnado — had shot the victim; thus, he argued the statement was highly prejudicial to Moore. The trial judge denied the motion for a mistrial and allowed the hearsay statement as a dying declaration by the victim.
¶ 21. The standard of review for the admission of testimonial evidence is an abuse of discretion, and such admissions are left to the sound discretion of the trial judge. Any error warrants reversal only when the abuse of discretion prejudices the accused. Trotter v. State, 9 So.3d 402, 407 (¶ 9) (Miss.Ct.App.2008). Dying declarations are an exception to the exclusion of hearsay statements under Mississippi Rule of Evidence 804(b)(2). Such a declaration is defined as “a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.” M.R.E. 804(b)(2). The statement is considered a dying declaration if: “1. The wounded person is in ex-tremis and dies after making the statement, 2. The person realizes that he is mortally wounded, and 3. He has no hope of recovery.” Trotter, 9 So.3d at 407 (¶ 9) (citing Watts v. State, 492 So.2d 1281, 1287 (Miss.1986)).
¶ 22. The case at hand is very similar to Trotter, where this Court found no error with the trial court’s admission of hearsay testimony into evidence as a dying declaration. Id. at (¶ 11). In Trotter, a law-enforcement officer was allowed to testify that, upon finding the victim shot in a doorway, the victim told him the defendant had shot him. Id. at (¶ 9). This Court stated that in this situation it could be inferred the victim knew he was dying. Id. at (¶ 11). “[K]nowledge of impending death may be inferred from the nature and extent of the wound inflicted upon the victim” without any expressed declaration of the victim to show “he was sensible of impending death.” Id. at (¶ 11) (citing Watts, 492 So.2d at 1287-88).
*1154 ¶ 23. Here, as in Trotter, it can be inferred from the situation that at the time Flowers made the statement to Holmes, Flowers knew of his impending death and had no hope of recovery even if he did not specifically declare it. As Dr. Hayne testified, Flowers had been shot through the heart, and the bullet was lodged in his lung cavity. He was profusely bleeding internally, and while he might not have passed away immediately after being shot, he did shortly thereafter. One of the officers that first responded to the dispatch call stated Flowers was lying on his back on the floor in the game room, and he did not appear conscious. Another officer testified that Flowers was pronounced dead upon his arrival at the hospital. We find because of the circumstances surrounding Flowers’s shooting, the trial court did not err in admitting Holmes’s testimony about Flowers’s dying declaration.
3. Sufficiency of the Evidence of the Armed Robbery of Ratliff
¶ 24. Moore argues that there was insufficient evidence to support a conviction for the armed robbery of Ratliff because the evidence shows nothing was taken from Ratliff. Thus, Moore claims the trial court erred in denying his motion for a directed verdict or JNOV.
¶ 25. A motion for a directed verdict and JNOV challenges the sufficiency of the evidence. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). The critical inquiry “is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). If the facts and inferences “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” this Court must reverse and render. Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss. 1985)). However, if the evidence is such that, “ ‘having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,’ the evidence will be deemed to have been sufficient.” Id.
¶ 26. Mississippi Code Annotated section 97-3-79 (Rev.2006) provides the elements of armed robbery:
Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery....
(Emphasis added). Moore claims that because Ratliff claimed he was not robbed of anything and no threats were made by the robbers, Moore cannot be guilty of the armed robbery of Ratliff. We disagree.
¶ 27. At trial, Ratliff testified that two armed, masked men, whom he identified as Moore and Varnado, kicked in the door to the game room. They hollered and ordered everyone on the floor while firing a firearm once into the air. Ratliff acknowledged that Moore and Varnado were serious about robbing the men in the room and then proceeded to take their money. While Ratliff did not lose any money to the robbers because he did not have any at that time, already having lost all of his money in the dice game, he admitted that Moore and Varnado had attempted to rob him and he was “scared for his life.”
¶ 28. Because the evidence shows Moore attempted to take the property of *1155 Ratliff in a violent matter against his will, there is sufficient evidence of guilt of armed robbery. A rational trier of fact could find the essential elements of armed robbery were met beyond a reasonable doubt. This issue is without merit.
CONCLUSION
¶ 29. Because Moore was not prejudiced by the inadvertent exclusion of two exhibits from the jury deliberations, the error was harmless. It can be inferred from the situation surrounding Flowers’s shooting that he knew of his impending death when he made the statement to Holmes that one of the two robbers had shot him; thus, the admission of this hearsay statement under the dying declaration exception of Rule 804(b)(2) was not error. Finally, there was sufficient evidence of guilt for the armed robbery of Ratliff. Finding no reversible error, we affirm Moore’s convictions and sentences.
¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF MARION COUNTY OF CONVICTION OF COUNT I, CONSPIRACY TO COMMIT ARMED ROBBERY, AND SENTENCE OF FIVE YEARS; COUNTS II, III, IV, V, VI, AND VII, ARMED ROBBERY, AND SENTENCE OF TWENTY YEARS FOR EACH COUNT; AND COUNT VIII, MANSLAUGHTER, AND SENTENCE OF TWENTY YEARS, WITH THE SENTENCES IN COUNTS I, II, AND VIII TO RUN CONSECUTIVELY, AND WITH THE SENTENCES IN COUNTS III, IV, V, VI, AND VII TO RUN CONCURRENTLY WITH COUNT II, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY A $1,000 FINE, HIS PART OF $6,725 IN RESTITUTION, AND HIS PART OF A $4,500 FEE TO THE MISSISSIPPI CRIME VICTIMS’ COMPENSATION FUND, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, ISHEE, ROBERTS, CARLTON AND RUSSELL, JJ„ CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT.

. Testimony at trial established "Munt” is David Holmes’s nickname.

. Earlier in his testimony Holmes had identified Moore and Varnado as the men who kicked in the door of the game room.