989 So.2d 437 (2008)
Buddy John RAVENCRAFT, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2007-KA-01825-COA.
Court of Appeals of Mississippi.
August 12, 2008.
*438 George T. Holmes, Jackson, attorney for appellant.
Office of the Attorney General by Stephanie Breland Wood, attorney for appellee.
Before LEE, P.J., CHANDLER, GRIFFIS and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. On September 19, 2007, a jury sitting before the Amite County Circuit Court found Buddy John Ravencraft guilty of murder, grand larceny, and unlawful possession of a motor vehicle. Incident to the murder conviction, the circuit court sentenced Ravencraft to life imprisonment. As for Ravencraft's grand larceny conviction, the circuit court sentenced Ravencraft to ten years to run consecutive to Ravencraft's life sentence. Finally, the circuit court sentenced Ravencraft to five years for unlawful possession of a motor vehicle to run consecutive to Ravencraft's ten-year sentence for grand larceny. Aggrieved, Ravencraft appeals.
*439 ¶ 2. Ravencraft raises two issues based on ineffective assistance of counsel. First, Ravencraft argues that his counsel was ineffective because he failed "to object to improper prejudicial evidence." Second, Ravencraft argues that his counsel was ineffective because he did not request a lesser-included manslaughter instruction. Finally, Ravencraft argues that the weight of the evidence does not support a murder conviction. Finding no error, we affirm.

FACTS AND PROCEDURAL HISTORY
¶ 3. As a preliminary matter, it is necessary to discuss the various individuals involved in this case, as well as the relationships between those people. Ravencraft was found guilty of the murder of Jerry Wayne Simmons. Jerry was sixty-one years old when Ravencraft killed him. Ravencraft did not happen upon Jerry by some unfortunate stroke of luck. Rather, Ravencraft's older sister, Bobbie Miller, lived with Jerry. Bobbie was the former wife of Jerry's stepson, Ed "Stoner" Jones. Jerry took in Bobbie and her two childrenone of whom was Jerry's grandchild. However, Jerry and Bobbie's relationship was not purely one of cohabitation. Jerry and Bobbie were sexually involved as well. Based on the record before us, it appears that this aspect of their relationship was ultimately the catalyst that led to Jerry's murder.
¶ 4. As of Wednesday, October 18, 2006, Bobbie was on probation for misdemeanors, and Ravencraft had recently been released from prison. They happened across one another during an overlapping visit to their respective probation and post-release supervision officers. Ravencraft asked Bobbie whether he could spend the night at Jerry's house. Bobbie asked Jerry, and Jerry consented.
¶ 5. The next day, per her routine, Bobbie woke up around 2:00 p.m. Bobbie and Ravencraft visited Bobbie's "boyfriend" Russell Lovett (Russell) and started drinking. At some point, Ravencraft discovered that Bobbie was sexually involved with Jerry. Ravencraft became upset. He told Bobbie she was a "disgrace to the Ravencraft name."
¶ 6. Disgraced name notwithstanding, Ravencraft asked Bobbie whether he could spend another night at Jerry's house. Because it was up to Jerry, Bobbie and Ravencraft went back to Jerry's house to ask him. When Jerry arrived, he told Bobbie that Ravencraft could spend the night, but for one more night only.
¶ 7. Jerry had recently purchased some beer and tequila, which he shared with Ravencraft. Later, Jerry managed to call Bobbie into the kitchen to discuss whether Ravencraft's presence might alter their routine Thursday-night-sexual rendezvous. Bobbie told Jerry that Ravencraft's presence would not change their schedule, so Jerry took his medication. According to Bobbie, Ravencraft must have overheard that conversation because Ravencraft walked into the kitchen and asked "what pill [Bobbie and Jerry were] talking about."
¶ 8. By Bobbie's version of events, Jerry and Ravencraft went back into the living room, where they talked and laughed. However, Ravencraft began to behave sarcastically toward Jerry. At trial, Bobbie testified that Ravencraft was "pitching things at" Jerry. Bobbie paraphrased Jerry as having asked Ravencraft whether he "did something" to upset Ravencraft. Bobbie testified that Ravencraft laughed and said, "no." However, Bobbie responded affirmatively when asked whether it was obvious that Ravencraft was upset about something.
*440 ¶ 9. The tension continued to escalate when Ravencraft stood behind Jerry while Jerry read a newspaper. According to Bobbie, Ravencraft "pick[ed] on [Jerry]" about Jerry's gray hair. Jerry did not accept Ravencraft's teasing him without responding. Jerry asked Ravencraft why he was standing behind him. Ravencraft replied that he was "just looking" at the newspaper. Jerry retorted and suggested that Ravencraft was illiterate when he said, "well, I know you can't read." Bobbie testified that Jerry "didn't mean nothing by it." However, Bobbie also testified that Ravencraft "didn't like [Jerry's comment] too much."
¶ 10. Ravencraft returned to his spot on a couch near Jerry's chair, but it appears that the verbal sparring between Ravencraft and Jerry continued to escalate. Jerry continued to ask Ravencraft why he was upset. Bobbie's testimony did not clarify how they got on the topic, but eventually Jerry apparently began to discuss Ravencraft and Bobbie's father, who was ill. Bobbie testified, "[Jerry] didn't mean nothing by it. Just saying everybody's going to die, you know." It is unclear exactly what was said, but whatever it was, Ravencraft "didn't like it too much" either. Based on the context of Bobbie's testimony, it appears that Ravencraft took whatever Jerry said as an insult to his and Bobbie's father.
¶ 11. At that point, the verbal confrontation escalated and became physical. Bobbie testified that Jerry "had done had enough." When Jerry got up to go into the kitchen, Ravencraft "grabbed him from behind and choked him to the floor." Bobbie elaborated that Ravencraft grabbed Jerry around the neck, that she heard Jerry's neck pop, and that Ravencraft said "he had broken [Jerry's] neck." Bobbie testified that Jerry's body was "jumping around" and that Jerry appeared to be breathing.
¶ 12. Bobbie called Russell and told him that Ravencraft "had just hurt [Jerry]." Russell told Bobbie he was on his way. Meanwhile, Ravencraft was "hollering" to Bobbie that she should "get whatever [she] need[ed] and . . . get out." When Ravencraft saw that Bobbie had a telephone, he "snatched the phone slap out of the wall."
¶ 13. Ravencraft had Jerry's blood on his hands because Jerry's nose was bleeding. Ravencraft then left the living room, but Bobbie did not know where he went. According to Bobbie, she began to get her bags together. When Bobbie returned to the living room, she saw Ravencraft put a pillow over Jerry's head. Ravencraft then shot Jerry once, "point blank." Ravencraft told Bobbie to "get the fout." Bobbie complied. Bobbie heard two more shots as she ran outside.
¶ 14. Bobbie got in her car and drove to the "end of the road" where she met Russell. Bobbie told Russell that Ravencraft killed Jerry. Russell told Bobbie to follow him back to his brother's house. Bobbie did not see Ravencraft again until he "came out behind us in" Jerry's burgundy 2002 Chevrolet S-10 pickup. In separate vehicles, they all proceeded to Russell's brother's house.
¶ 15. Once they arrived, Russell told Ravencraft that Ravencraft "need[ed] to go back and get rid of the evidence." Bobbie elaborated and testified that Russell told Ravencraft that Ravencraft needed to "get rid of [Jerry's] body." When asked "[w]as there any conversation with . . . Ravencraft about how to get rid of the body," Bobbie answered, "[b]urn it." Bobbie, Russell, and Ravencraft then went back to Jerry's house. Russell drove Bobbie's car, and Ravencraft drove Jerry's truck.
*441 ¶ 16. Russell would not go on Jerry's property, so he and Bobbie waited at the end of Jerry's driveway. According to Bobbie, Russell "knew that [Jerry] had filed a restraining order against him" because Jerry had told Russell "several times to get off his property which he didn't do."[1]
¶ 17. Russell became impatient with Ravencraft, so he sent Bobbie to see what was causing Ravencraft's delay. Bobbie walked halfway down Jerry's driveway, where she saw Ravencraft in Jerry's barn. Ravencraft left the barn with a gas can. Ravencraft put the gas can in the back of Jerry's truck, and they all left, but Ravencraft "was hollering that he needed some gas."
¶ 18. Russell and Bobbie were in Bobbie's car, and Ravencraft was in Jerry's truck. Russell followed Ravencraft to a place in Pike County where Bobbie once lived. Russell parked away from Ravencraft, who was in Jerry's truck. While Ravencraft "was doing something to the truck," Russell was telling Ravencraft to "hurry up." Ravencraft told Russell to "pop the trunk." Russell did, and Ravencraft threw "what looked like guns to [Bobbie] in the back of it, including the gas can."
¶ 19. Bobbie did not see Ravencraft pour gasoline on Jerry's truck, but she did see Ravencraft throw a glass "when he set [Jerry's truck] on fire." Ravencraft then got into Bobbie's car, but they did not leave immediately because Ravencraft "wanted to see [for a] fact [that] the truck bl[e]w up." When asked whether the truck did "in fact, blow up," Bobbie testified, "[i]t did."
¶ 20. Using Bobbie's car, Russell drove Ravencraft "somewhere" in southern Pike County. Once they arrived, Ravencraft told Russell to again "pop the trunk." Ravencraft took out whatever he put in Bobbie's trunk and handed those things to a friend of Ravencraft's who Bobbie was not able to identify. Ravencraft told Russell, "you don't know me ... and you have never seen me before." Ravencraft also told Russell to take care of Bobbie. Ravencraft then looked at Bobbie and told her, "[i]f you tell anybody about what I just did, I'll pop a cap in your [sic] a , too."
¶ 21. The next morning, James Sparacello, an investigator with the Pike County Sheriff's Department, received a dispatch call. There had been a report of a burned vehicle. Investigator Sparacello decided to follow Deputy Greg Chambliss to the scene. As Investigator Sparacello looked for a vehicle identification number, he realized there were charred human remains in the passenger seat of the truck. Investigator Sparacello requested additional responders, and the Mississippi Highway Patrol's investigative division, the Mississippi Bureau of Investigation, responded. While they waited for others to arrive, Investigator Sparacello and Deputy Chambliss roped off the area.
¶ 22. Authorities were able to determine that the truck had an Amite County license plate and a partial number. Eventually, authorities from Amite County and Pike County quickly discovered that the truck belonged to Jerry. Amite County authorities visited Jerry's house, but no one was there. Eventually, Jerry's son, Robert Newton, among others, visited Jerry's home and reported that they found blood, a spent projectile, and empty bullet *442 cartridges at Jerry's house. Robert also reported that Jerry's guns were missing, as well as the case in which Jerry kept his medication. Jerry's family informed authorities that they should speak to Bobbie and Russell.
¶ 23. Russell and Bobbie were interviewed in separate rooms. Those interviews led authorities to Ravencraft and, on October 21, they apprehended Ravencraft as he hid under a house, albeit only after deploying a chemical called "Clear Out," described as "basically like tear gas." A search of the house under which Ravencraft hid revealed a .38 caliber Taurus revolver that belonged to Jerry. The rest of Jerry's firearms were recovered when an acquaintance of Ravencraft's delivered them to authorities. Those firearms were a Bryco Arms .380 caliber semi-automatic pistol, a Ruger 1022 caliber rifle, a Remington 870 shotgun, and a Remington model 742 rifle.
¶ 24. Ravencraft waived his right to remain silent and gave a videotaped statement in which he admitted that he killed Jerry. However, according to Ravencraft, he did so in Bobbie's defense. That is, Ravencraft claimed that Jerry was beating Bobbie and that it was necessary to kill Jerry in her defense.
¶ 25. Dr. Steven Hayne conducted an autopsy of Jerry's remains and concluded that Jerry did not die as a result of the fire. Instead, Dr. Hayne concluded that Jerry died as the result of at least one gunshot wound through the right and left lungs. Dr. Hayne testified that Jerry could have sustained other gunshot wounds, but based on the burned condition of Jerry's remains, Dr. Hayne could not definitively reach that conclusion.
¶ 26. On March 5, 2007, an Amite County grand jury returned an indictment and charged Ravencraft with murder, grand larceny, and unlawful possession of a vehicle. Ravencraft pled not guilty, and on September 18, 2007, Ravencraft went to trial before the Amite County Circuit Court.
¶ 27. The next day, the jury found Ravencraft guilty of all three counts. The circuit court sentenced Ravencraft to life imprisonment for murder. For grand larceny, the circuit court sentenced Ravencraft to ten years' imprisonment. The circuit court set that sentence to run consecutive to Ravencraft's sentence for murder. As for Ravencraft's conviction for unlawful possession of a vehicle, the circuit court sentenced Ravencraft to five years' imprisonment to run consecutive to Ravencraft's sentence for grand larceny. Ravencraft appeals.

ANALYSIS

I. WHETHER TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO IMPROPER PREJUDICIAL EVIDENCE.
¶ 28. Ravencraft first claims that his attorney was ineffective because he did not object to a portion of Detective Davis Haygood's testimony. Detective Haygood testified that when officers arrived to arrest Ravencraft at Brian Knight's house in Magnolia, Knight stated, "Ravencraft had went inside and had a gun in his hand and had also made a statement to him that [Ravencraft] had killed someone."
¶ 29. Ravencraft raises this issue in his direct appeal. "While this Court may consider the merits of a claim of ineffective assistance of counsel raised for the first time on direct appeal, it is unusual to do so because `[w]e are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim.'" Wynn v. State, 964 So.2d 1196, 1200(¶9) (Miss.Ct.App.2007) (quoting Wilcher *443 v. State, 863 So.2d 776, 825 (¶ 171) (Miss.2003)). On direct appeal, we will reach the merits of a claim of ineffective assistance of counsel only where: "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." Wilcher, 863 So.2d at 825 (¶ 171) (citation omitted).
¶ 30. There is no mutual stipulation as to the adequacy of the record. Accordingly, we must first determine whether the record affirmatively demonstrates that Ravencraft was denied effective assistance of counsel. In so doing, we must determine whether Ravencraft's representation was "so lacking in competence that it becomes apparent or should be apparent that it is the duty of the trial judge to correct it so as to prevent a mockery of justice." Ransom v. State, 919 So.2d 887, 889(¶ 9) (Miss.2005).
¶ 31. To prove a claim of ineffective assistance, Ravencraft must show (1) that his defense counsel's performance was deficient, and (2) that his counsel's deficient performance was prejudicial to his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Swington v. State, 742 So.2d 1106, 1114(¶ 22) (Miss.1999). Ravencraft bears the burden of proving both prongs of Strickland, and he faces a rebuttable presumption that his attorney's conduct is within the wide range of reasonable conduct and that his attorney's decisions were strategic. Edwards v. State, 615 So.2d 590, 596 (Miss.1993) (citing Leatherwood v. State, 473 So.2d 964, 969 (Miss. 1985)). To rebut this presumption the defendant must demonstrate that, but for his attorney's unprofessional errors, the outcome of his trial would have been different. Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Wynn, 964 So.2d at 1200(¶ 11).
¶ 32. Ravencraft was not prejudiced by Detective Haygood's testimony. By way of his videotaped confession, Ravencraft admitted he killed Jerry. According to Ravencraft, Jerry was assaulting his sister, and it was necessary to kill Jerry to defend Bobbie. Detective Haygood's testimony regarding Knight's statement did not prejudice Ravencraft's defense, and Ravencraft was not prejudiced by the evidence he references.
¶ 33. Second, Ravencraft claims his attorney was ineffective because he declined to object to a portion of Bobbie's testimony. Bobbie testified that she ran into Ravencraft at the probation office. She had not seen him "since he had been locked up." Bobbie did not testify that Ravencraft was "locked up" for any particular offense. If Ravencraft experienced any prejudice as a result of Bobbie's statement, it is certainly not enough to conclude that, but for Ravencraft's failure to object to Bobbie's testimony, Ravencraft would not have been convicted.
¶ 34. Third, Ravencraft claims his counsel was ineffective because he failed to request a lesser-included instruction for manslaughter. As mentioned, there is a rebuttable presumption that counsel's decisions are tactical, and this allegation clearly fits within that presumption. That is, defense counsel could have strategically declined to request a manslaughter instruction based on the concept that, had the jury failed to convict Ravencraft of murder, there would have been no lesser-included offense by which the jury could convict Ravencraft. Under those circumstances, Ravencraft would have been acquitted.

II. WHETHER THE WEIGHT OF THE EVIDENCE SUPPORTS A *444 MANSLAUGHTER CONVICTION RATHER THAN A MURDER CONVICTION.
¶ 35. Ravencraft claims the verdict is against the weight of the evidence. According to Ravencraft, "[n]o reasonable juror could have found murder if properly instructed; because, under either version of what happened[,] [Jerry] died as a result of an impulse brought on by sufficient provocation."
¶ 36. "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." Anderson v. State, 856 So.2d 650, 652(¶ 6) (Miss.Ct.App.2003). "Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." Id. "Thus, if the verdict is against the overwhelming weight of the evidence, then a new trial is proper." Id.
¶ 37. Ravencraft claims that Jerry "died as a result of an impulse brought on by sufficient provocation." However, Ravencraft completely and utterly failed to detail what he considers "sufficient provocation." Bobbie testified that Jerry got up and had begun walking into the kitchen when Ravencraft ran and grabbed Jerry from behind. There was no testimony that Jerry had a weapon, and there was no testimony that Ravencraft had to use deadly force under the circumstances. This assignment of error is entirely meritless.
¶ 38. THE JUDGMENT OF THE AMITE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND SENTENCE OF LIFE IMPRISONMENT, AND COUNT II, GRAND LARCENY, AND SENTENCE OF TEN YEARS TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, AND COUNT III, UNLAWFUL POSSESSION OF A MOTOR VEHICLE, AND SENTENCE OF FIVE YEARS TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT II, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO AMITE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] Bobbie stated that Jerry filed complaints with the Amite County Sheriff's Department after an incident in which Russell was "sitting outside [Jerry's] window" beating on it. According to Bobbie, Russell "apparently didn't know when to stay away when somebody told him to."