# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00094-COA

### CONSOLIDATED WITH

### NO. 2005-KA-00379-COA

LEON LAMAR TROTTER A/K/A LEON                                    APPELLANT
TROTTER

v.

STATE OF MISSISSIPPI                                              APPELLEE

DATE OF JUDGMENT:                  11/26/2018
TRIAL JUDGE:                       HON. JANNIE M. LEWIS-BLACKMON
COURT FROM WHICH APPEALED:         HUMPHREYS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:           WALTER H. BOONE
                                   ANDY LOWRY
ATTORNEY FOR APPELLEE:             OFFICE OF THE ATTORNEY GENERAL
                                   BY: BARBARA WAKELAND BYRD
NATURE OF THE CASE:                CIVIL - POST-CONVICTION RELIEF
DISPOSITION:                       AFFIRMED - 05/31/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., GREENLEE, WESTBROOKS AND EMFINGER, JJ.

### GREENLEE, J., FOR THE COURT:

¶1.     Leon Trotter appeals from the Humphreys County Circuit Court's order denying post-

conviction collateral relief (PCR). We affirm the circuit court's judgment.[1]

### FACTS AND PROCEDURAL HISTORY

¶2.     In 2004, a grand jury returned an indictment against Trotter and Alvin Pittman for the

---

[1] This appeal is consolidated with cause number 2005-KA-00379-COA, Trotter's direct criminal appeal, for record purposes only.

murder of Ricky Hill. Trotter was also indicted for the manufacture of marijuana. Pittman ultimately pled guilty to manslaughter.

¶3. The court appointed attorney W.C. Trotter III to represent Trotter; however, at some point, Trotter hired attorney Joe Buchanan to represent him. On the eve of trial, Buchanan filed a "Motion to Produce" discovery. The motion was stamped filed on June 14, 2004; however, the certificate of service was dated June 17, 2004. Buchanan also filed a "Request for Discovery." The motion was stamped filed on June 14, 2004.

¶4. Trotter's murder trial was held on June 15 and 16, 2004. During the trial, several witnesses testified for the State. Officer Truron Grayson with the Belzoni Police Department testified that he was playing basketball when someone informed him that Hill was lying in the doorway of his home. Officer Grayson went to investigate and did in fact find Hill lying in his doorway. According to Officer Grayson, Hill was falling in and out of consciousness but said that he needed help. When Officer Grayson asked what happened, Hill said that he had been shot. When asked who shot him, Hill said, "Pooh Man . . . the guy who lives down the street . . . drives the blue Cadillac, lives in that trailer." Officer Grayson testified that Trotter fit this description. Officer Grayson knew Trotter "very well" as Trotter was his stepfather's cousin. He also testified that he observed a gunshot entry wound to Hill's chest. Later, it was determined that Hill had been lying in the doorway for approximately sixteen to seventeen hours.

¶5. Shortly thereafter, law enforcement noticed the Cadillac traveling down the road. Trotter's cousin, Michael Trotter (Michael), was driving the vehicle, and Alvin Pittman was

2

in the passenger seat. After stopping the vehicle, law enforcement recovered a gun from under the seat, and Pittman was arrested. Then law enforcement spotted Trotter in another vehicle and arrested him as well.

¶6.     Trotter provided two statements to law enforcement. In the first statement, Trotter said, "It was 12:00 a.m. Me and [Pittman] went to Ricky Hill's house and knocked on the door. He said, 'Who is it?' I said, 'It's Cliff.' He opened the door, and [Pittman] shot him." In the second statement, Trotter said:

> At about 12:00 a.m., [Pittman] and myself decided to go to Ricky Hill's house and get $35 he owed me for the drugs that I gave him on credit. We parked by the church and walked to Ricky Hill's house. When we arrived at his house, I knocked on his door. He asked, "Who it is?" I said, "Cliff," and Ricky opened the door. [Pittman] then pulled out a gun and shot Mr. Hill. I watched Ricky fall to the floor, and I looked back. [Pittman] was running, so I ran, too. We went to a car, and then we went - - when we made it to his house, we ate. When my aunt and her friends left, he started talking about where he shot Ricky. I said that he might die, and [Pittman] said, "He is, because I shot him in the heart." And then [Pittman] said, "The only reason I shot him one time is because the gun jammed, jammed up." Then we went to sleep.

The State presented evidence that the church where the Cadillac was parked was more than 500 yards from Hill's home.[2]

¶7.     Forensic pathologist Dr. Steven Hayne testified that the cause of Hill's death was a gunshot wound to the chest that led to bronchial pneumonia and an infection of the lungs, and the manner of death was homicide. Trotter's former girlfriend, Latoya Cooks, testified that she planned to sell a .380 handgun to Trotter's aunt before the shooting, but she gave it to Trotter instead. Later, it was determined to be the same handgun that law enforcement

---

[2] Trotter also gave a third statement regarding two guns.

recovered from the Cadillac. And a forensics firearm expert testified that the bullet retrieved from Hill's body was fired from that gun.

¶8.    Trotter was the only witness to testify in his defense at trial. Trotter testified that Pittman had reminded him that Hill owed him $35 for marijuana, and he admitted that they went to Hill's home around midnight. Trotter confirmed that the gun used in the shooting was his and that he kept it under the seat of the Cadillac. However, he testified that he did not know that Pittman had the gun, and he testified that Pittman shot Hill. According to Trotter, he had no reason to shoot Hill, but Pittman did not like Hill and had "got into it with [him]" before the shooting.

¶9.    The jury received numerous instructions on the law, including instructions for the crimes of aiding and abetting, murder, and manslaughter. Ultimately, the jury found Trotter guilty of murder as charged, and he was sentenced to life imprisonment.[3] After the denial of his post-trial motion, attorney Lisa Ross filed, on Trotter's behalf, a motion for an out-of-time appeal.[4] The court granted the motion.

¶10.    This Court affirmed Trotter's conviction but permitted Trotter to raise his ineffective-assistance claim in post-conviction proceedings. *Trotter v. State*, 9 So. 3d 402, 411-12 (¶¶23, 30) (Miss. Ct. App. 2008). Subsequently, Trotter filed an application for leave to proceed

---

[3] "[A]lthough 'murder does not carry a specific sentence of life without parole,' [Mississippi Code Annotated] Section 47-7-3(1)(h)[,] rendered [Trotter's] life sentence 'tantamount to life without parole.'" *Jones v. State*, 122 So. 3d 698, 700-01 (¶6) (Miss. 2013) (quoting *Parker v. State*, 119 So. 3d 987, 996 (¶22) (Miss. 2013)).

[4] The motion stated that Trotter had been represented by W.C. Trotter III and that he had failed to file a notice of appeal on Trotter's behalf.

in the circuit court with his post-conviction relief request, which our supreme court granted.[5]

¶11.    In 2018, attorney Walter Boone filed, on Trotter's behalf, a "Motion to Set Evidentiary Hearing and/or Resentencing Hearing."[6]  The motion asserted that Trotter was entitled to post-conviction relief on three grounds.  First, Trotter was entitled to a new trial based upon statements made by Pittman in an affidavit executed in 2009.  The affidavit read, in relevant part:

> Trotter didn't have any knowledge of the crime before the fact and did not commite [sic] such crime.  I . . . was the one who shot . . . Hill and told . . . Trotter not to say anything to anybody or he will be next.  The only reason that . . . Hill didn't say my name was because he didn't get the chance to see my face because I was standing off to the side. . . .  Trotter was just going to get his money.  I . . . had once got into it with . . . Hill at a night club in . . . Silver City, MS, and got the gun without . . . Trotter knowing and when we arrived at . . . Hill's house, I . . . shot him because of the problem that I had at the club four days before the incident happened.

¶12.    Second, the motion asserted that Trotter had received ineffective assistance of counsel.  Specifically, the motion alleged that trial counsel (Buchanan) failed to interview and call two key witnesses—Adam Gregory and Michael Trotter.  In his affidavits, Gregory stated that he saw Pittman pull a gun on Hill the day before the shooting and that he was present when Hill identified the shooter as "the guy in the Cadillac's friend."  Additionally, Michael stated in an affidavit that Gregory told him that Hill identified the shooter as "the

---

[5] The record indicates that the supreme court granted an application for leave in July 2012, and the supreme court granted another application for leave in October 2014, based on the United States Supreme Court's ruling in *Miller v. Alabama*, 567 U.S. 460 (2012).

[6] Trotter had previously filed a pro se motion for post-conviction relief.  Additionally, Jane Tucker filed, on Trotter's behalf, a "Motion for Post-Conviction Relief and to Hold a Resentencing Hearing."  Thereafter, Trotter seemingly initiated a number of mandamus proceedings before the supreme court.

5

boy in the blue Cadillac's partner" and that he saw Pittman place a bag that contained a gun under the seat of the Cadillac before they were stopped by law enforcement. The motion also alleged that trial counsel was ineffective by waiting until the eve of trial to request discovery and by failing to request a continuance.

¶13. Finally, the motion asserted that Trotter was entitled to resentencing under *Miller* because he was a juvenile when he was sentenced to life without eligibility for parole.

¶14. The circuit court held that Trotter was entitled to an evidentiary hearing and a new sentencing hearing. The court "granted an evidentiary hearing on [Trotter's] claims for a new trial, alleged ineffective assistance of counsel, and resentencing under *Miller*" and scheduled "[s]aid evidentiary hearing" for August 31, 2018.

¶15. At the hearing, Boone reiterated, on Trotter's behalf, that there were three issues pending before the court. He argued that resentencing under *Miller* was one of them, but stated, "[Y]ou don't need an evidentiary hearing for that. That matter is [ripe] for [the court's] consideration based on the law and some of the things we submitted to Your Honor." He then called several witnesses in support of Trotter's ineffective-assistance-of-counsel claim and his claim that he was entitled to a new trial based on Pittman's affidavit.

¶16. Trotter's mother, Angela Trotter (Angela), suggested that Buchanan should have called Jerome Evans and Carl Lee as defense witnesses at trial. According to Angela, Evans heard Hill say, "Poo[h] Man buddy shot me . . . ," and Lee may have heard the same thing. Angela testified that although Buchanan already had the witnesses' names, she let Buchanan

6

know that they were present during the trial, but Buchanan did not let them testify.[7] At the time of the hearing, Lee was deceased, and Evans was not called as a witness to verify Angela's testimony.

¶17. Trotter's cousin, Michael, testified that Adam Gregory also heard Hill's dying declaration. Additionally, Michael testified that he saw Pittman put a Crown Royal bag under the seat of the vehicle, which was a "family car," and that the police found a gun inside the bag. Although Michael never spoke with Buchanan, he admitted that he thought Buchanan "kn[e]w what [he] knew." Earlier, Angela testified that Michael was not available at trial.

¶18. A bench warrant was issued for Gregory when he did not appear at the hearing, and he eventually testified under subpoena. Gregory testified that he sold drugs with Trotter and Pittman and that he had known Hill his entire life. According to Gregory, Pittman cocked a pistol at Hill during an altercation at Hill's house the day before the shooting. Gregory testified that someone told him that Hill had been shot the next day. Gregory testified that when he arrived at the scene, there were "quite a few people there."[8] According to Gregory, he distinctly overheard Hill say that the guy on the passenger side of the car shot him. When asked which car, Gregory said, "[t]he black Cadillac." When he was questioned about the color, he responded, "I did drugs and everything so I'm not 100 percent clear on every detail . . . ." Then he testified that he assumed the Cadillac was Trotter's and that Trotter was

---

[7] Trotter later testified that Buchanan said that it would not be a "good thing" to presumably call Lee at trial.

[8] Officer Grayson later testified that he did not see Gregory at the scene.

driving it. However, he clarified that Hill only said, "The guy on the passenger side shot me," and he did not know who was on the passenger side of the vehicle. Gregory testified that Buchanan did not interview him. However, he began to admit that he was "pretty sure the [district attorney] thought I didn't even know anything about" presumably the shooting, but counsel cut off his response. Finally, Gregory testified that he executed an affidavit because he assumed they were trying to help Trotter lessen his sentence.

¶19. Trotter's testimony at the hearing was similar to his testimony at trial. Trotter maintained that Pittman talked him into going to Hill's house to get the $35 that Hill owed him for marijuana. Trotter testified that he kept a gun under the seat of the Cadillac and that Pittman must have found the gun. According to Trotter, when he knocked on Hill's door, Hill looked at him through a window. Trotter testified that he said his name and then "went to joking" and said that his name was "Cliff." Trotter maintained that Pittman shot Hill when he opened the door. According to Trotter, he talked to his court-appointed attorney (W.C. Trotter III) about the case. He also testified that he met with Buchanan once before trial, but he did not remember talking about what happened or discussing witnesses.

¶20. Micky Mallette, another attorney, testified that he shared an office space with Buchanan and that he assisted Buchanan during Trotter's trial. Mallette testified that his only material participation in Trotter's case was handling a motion and possibly taking notes during jury selection. When asked about Buchanan's discovery requests, Mallette testified that he (Mallette) had previously filed a motion for discovery when he already had what he was asking for, and he stated "[b]ased on my experience, . . . I don't know that I would look

8

at the document in and of itself and determine it has any conclusiveness on whether [Buchanan] did or did [not]" have the case file. When asked about interviewing witnesses, Mallette testified that he did not know if Buchanan interviewed any witnesses in Trotter's case, but it "would be unusual" if Buchanan had not. Mallette also disagreed with the assertion that it was a sign of incompetence that Buchanan did not call any witnesses besides Trotter. Overall, Mallette thought Buchanan was "a very competent attorney." And Mallette testified that if Buchanan had been deficient at trial, "I would like to think that . . . I would have alerted the bar or the court or someone else[,] and I know I didn't do that."

¶21. Finally, Trotter called Pittman to testify. Despite his affidavit to the contrary, Pittman testified that he did not shoot Hill. Rather, Trotter was the shooter. He also testified that he did not have a dispute with Hill in the days before the shooting. When asked about his affidavit, Pittman said that it was not truthful and that he was coached into writing it. According to Pittman, a female attorney told him that he could not be charged anymore, and he wanted to help Trotter because of the sentence that Trotter had received. According to Pittman, Trotter told him what to write in the affidavit, and he was worried about the consequences of being untruthful at the hearing.

¶22. After hearing the testimony of Trotter's witnesses, the State called Officer Grayson to testify. According to Officer Grayson, he was playing basketball when someone asked him to check on Hill. He testified that Jerome Evans and Carl Lee—the two witnesses who may have heard Hill say, "Poo[h] Man buddy shot me . . . ," according to Angela Trotter—were with him when he found Hill lying in the doorway of his home. According

9

to Officer Grayson, Hill said that "Poo[h] Man . . . [,] the guy in the blue Cadillac that lived down in the trailer," shot him. There was no doubt in Officer Grayson's mind that Hill said "Poo[h] Man" and that Trotter fit that description. Officer Grayson was not aware of anyone who heard anything different, and nobody ever told him that Hill did not say "Pooh Man." Additionally, he testified that he and Lee possibly had a conversation about different opinions of what happened, and Lee never said that he was wrong. Officer Grayson testified that Buchanan did not interview him prior to trial, but he gave a statement to law enforcement. Finally, Officer Grayson testified that he felt bad about testifying against his relative and that he did not have anything against Trotter.

¶23.    After the court heard all of the testimony, Boone addressed the resentencing issue on Trotter's behalf. Boone argued:

> [A]t a minimum, whatever happens here today on these other issues, the [c]ourt to be consistent with *Miller* . . . must vacate the prior sentence and reinstate another sentence . . . of [life] with the possibility of parole. . . . And I don't think that you need any of the evidence that you've heard in the hearing . . . to decide that. You can decide all of that as a matter of law and in fact I don't think there's much legal argument that . . . that shouldn't be the result.

In response, the State called Hill's sister, Gracie Hill, to give a statement to the court regarding sentencing. Then the State asked the court to resentence Trotter to life without eligibility for parole. Finally, Boone asked the court to vacate Trotter's sentence and impose a sentence of life with the possibility of parole.

¶24.    In November 2018, the court entered its judgment. The court found that Trotter failed to show that he had received ineffective assistance of counsel. Additionally, the court found

that Trotter was not entitled to a new trial based on Pittman's affidavit because Pittman testified at the hearing that his affidavit was untruthful and that he did not shoot Hill. Finally, the court addressed resentencing. The court, considering the *Miller* factors, found:

> Trotter was under the age of 18 at the time of the crime . . . . There was no evidence that [he] was immature for his age. The evidence adduced in this matter does not show Trotter's action was impetuous, it appeared that he acted with premeditation, in that he parked away from the victim's house, walked to the house, identified himself as someone else, then shot and killed the victim. The evidence at the hearing clearly showed that Trotter had a caring and loving family. There is no evidence to suggest that the area or environment Trotter lived affected the love and care he received from his family.
>
> Trotter submitted a defense of not being the shooter and having no knowledge that a crime was about to be committed. The jury did not accept Trotter's defenses and found Trotter guilty of deliberate-design Murder.
>
> Further, . . . Trotter acted as the leader of the crime, no peer pressure or other pressure affected his decision to shoot at the time of the incident. There is no evidence that Trotter was incompetent because of his youth to the extent he could not assist his attorney in his defense.
>
> Finally, . . . there is no evidence of the possible rehabilitation of Trotter considering his scheme to have [his] co-defendant, Pittman[,] recant his testimony in order to get a new trial.

Accordingly, the court denied Trotter's request to be resentenced to life with the possibility of parole.

¶25. Trotter subsequently filed a "Motion to Alter or Amend Judgment Pursuant to Rule 59 and Motion for Resentencing Hearing Pursuant to *Miller v. Alabama*." Trotter argued, among other things, that the court did not hold a resentencing hearing under *Miller* and therefore did not have any evidence related to the *Miller* factors before it when the judgment was entered. He also filed a motion requesting funds for expert assistance in the field of

11

psychology, a motion requesting funds for expert assistance in the field of mitigation investigation, and a motion requesting that Trotter be sentenced by a jury. After a hearing, the court denied Trotter's motions.

¶26. On appeal, Trotter raises four issues: (1) whether the circuit court erred by ruling that he did not receive ineffective assistance of counsel; (2) whether the circuit court violated his constitutional rights by "refus[ing] to hold an individualized *Miller* hearing"; (3) whether the circuit court misapplied the law and abused its discretion in effectively resentencing him to life without eligibility for parole; and (4) whether the circuit court's order must be reversed because the *Miller* determination was made in the post-conviction proceeding. We consolidate these issues and address them as follows: (1) whether the circuit court erred by ruling that Trotter did not receive ineffective assistance of counsel, and (2) whether the circuit court erred by denying Trotter's request to be resentenced to life with the possibility of parole.

## STANDARD OF REVIEW

¶27. "When reviewing a [circuit] court's denial or dismissal of a PCR motion, we will only disturb the [circuit] court's decision if it is clearly erroneous; however, we review the [circuit] court's legal conclusions under a de novo standard of review." *Williams v. State*, 228 So. 3d 844, 846 (¶5) (Miss. Ct. App. 2017) (quoting *Thinnes v. State*, 196 So. 3d 204, 207-08 (¶10) (Miss. Ct. App. 2016)).

## DISCUSSION

¶28. We must decide whether the circuit court erred by denying post-conviction relief.

12

Specifically, we must decide whether the court erred by finding that Trotter failed to prove his ineffective-assistance-of-counsel claim and whether the circuit court erred by denying Trotter's request to be resentenced to life with the possibility of parole.

### I. Ineffective Assistance of Counsel

¶29. Trotter claims that the circuit court erred by finding that he failed to prove his ineffective-assistance-of-counsel claim. According to Trotter, Buchanan failed to (1) interview and call witnesses who would have shown that Pittman was the shooter, (2) conduct a proper investigation prior to trial, and (3) seek a continuance in order to repair those deficiencies.

¶30. To establish his ineffective-assistance-of-counsel claim, Trotter "must prove, under the totality of the circumstances, that (1) his defense counsel's performance was deficient, and (2) his counsel's deficient performance was prejudicial to his defense." *Payne v. State*, 282 So. 3d 432, 439 (¶23) (Miss. Ct. App. 2019) (citing *Ravencraft v. State*, 989 So. 2d 437, 443 (¶31) (Miss. Ct. App. 2008)). "In this regard, trial counsel's performance is deficient if it falls 'below an objective standard of reasonableness'; however, [Trotter] 'faces a rebuttable presumption that his attorney's conduct is within the wide range of reasonable conduct and that his attorney's decisions were strategic.'" *Id*. (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). Trotter "must show that, but for his trial attorney's errors, there is 'a reasonable probability' a different result would have been reached at trial." *Id*. (citing *Stringer v. State*, 627 So. 2d 326, 329 (Miss. 1993)).

### A. Witnesses

¶31.    At trial, Trotter's theory of defense was that Pittman was the shooter. A review of the trial transcript shows that this defense was adequately presented at trial. After Trotter's trial, Pittman executed an affidavit stating that he was the shooter. But Pittman testified at the hearing that his affidavit was untruthful. According to Pittman, Trotter was the shooter.

¶32.    Trotter presented additional evidence at the PCR hearing in an attempt to show that Pittman had an altercation with Hill the day before the shooting, that Officer Grayson's recollection of Hill's dying declaration was disputed by other witnesses, and that Pittman had possession of the gun after the shooting. According to Trotter, without this evidence, the jury convicted him of murder. But with this evidence, a reasonable jury could have reached a different result. For the reasons discussed below, we disagree.

¶33.    First, it is unclear whether Buchanan was aware of the allegation that Pittman had pointed a gun at Hill before the shooting. But Trotter testified at trial that Pittman did not like Hill and that Pittman had "got into it with [him]" before the shooting. He also testified that Pittman was the shooter.

¶34.    Second, Trotter's mother, Angela, testified at the hearing that two witnesses—Evans and Lee—disputed Officer Grayson's recollection of Hill's dying declaration. According to Angela, Evans heard Hill say, "Poo[h] Man buddy shot me . . . ," and Lee may have heard the same thing. However, one of the alleged witnesses—Evans—was not called as a witness at the hearing to verify Angela's testimony, and the other—Lee—was deceased. Furthermore, Angela testified that Buchanan already had their names at the time of trial. And when she told Buchanan that the witnesses were present during the actual trial, Buchanan did

14

not call them to testify. Similarly, Trotter testified that Buchanan said that it would not be a "good thing" to call presumably Lee at trial. It is well established that "[w]hen evaluating the overall performance of counsel, counsel must make strategic discretionary decisions including whether or not to . . . call certain witnesses . . . ." *Jones v. State*, 962 So. 2d 1263, 1274 (¶42) (Miss. 2007) (quoting *Havard v. State*, 928 So. 2d 771, 790 (¶31) (Miss. 2006)). Additionally, although Gregory testified that he heard Hill say, "The guy on the passenger side shot me," Gregory did not know who was in the passenger seat after the shooting. So Trotter's assertion that Pittman was the shooter remained uncorroborated.

¶35. Michael testified at the hearing that Pittman placed a gun under the seat of the vehicle before they were pulled over by the police. However, this evidence does not show that Pittman was the shooter either. Additionally, Trotter takes issue with the fact that his grandmother—the owner of the Cadillac—was not called as a witness to testify that other people drove the vehicle. However, evidence that other people had access to the vehicle was presented at trial.

¶36. Finally, even if Trotter established that Pittman was the shooter, he could still be convicted of murder. This Court noted in Trotter's direct appeal that "the jury was instructed that if it found beyond a reasonable doubt that someone other than Trotter committed the murder, but Trotter 'either directed or aided and abetted that person' during the murder, it should find Trotter guilty of murder." *Trotter*, 9 So. 3d at 412 (¶27). "Therefore the jury could have properly found Trotter guilty of murder without Trotter's actually having fired the shot that killed Hill." *Id*. The evidence presented at the hearing did not establish that

15

Pittman was the shooter. But even if it had, we cannot say that there is "'a reasonable probability' a different result would have been reached at trial." *Payne*, 282 So. 3d at 439 (¶23).

### B. Investigation and Continuance

¶37. Trotter also asserts that Buchanan's assistance was ineffective because he failed to investigate and failed to request a continuance. He further asserts that the circuit court erred by finding that these alleged failures did not amount to ineffective assistance of counsel.

¶38. Trotter takes issue with the fact that Buchanan filed a motion to produce and a request for discovery on the eve of trial. However, as noted by the State, Trotter's claim presumes that Buchanan had not already received discovery. But this was not proven. Trotter had court-appointed counsel before he hired Buchanan. Additionally, Mallette—who assisted with Trotter's defense—testified that he (Mallette) had previously filed a motion for discovery when he already had what he was asking for, and "[b]ased on [his] experience, [he would not] look at the [the request for discovery] in and of itself and determine it ha[d] any conclusiveness on whether [trial counsel] did or did [not]" have the case file. When asked about interviewing witnesses, Mallette testified that he did not know if Buchanan had interviewed any witnesses in Trotter's case, but it "would be unusual" if he had not. Overall, Mallette believed Buchanan was "a very competent attorney." And Mallette testified that if Buchanan had been deficient at trial, "I would like to think that . . . I would have alerted the bar or the court or someone else[,] and I know I didn't do that."

¶39. For the reasons discussed, we cannot say that the court erred by finding that Trotter

16

failed to prove his ineffective-assistance-of-counsel claim. This issue is without merit.

## II. Resentencing

¶40. "[T]here are two applicable standards of review in a *Miller* case." *Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018). "First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." *Id*. (citing *Smothers v. State*, 741 So. 2d 205, 206 (¶3) (Miss. 1999)). "If the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id*. (citing *Hampton v. State*, 148 So. 3d 992, 999 (¶21) (Miss. 2014)).

¶41. Trotter claims that the court failed to apply the correct legal standard. Specifically, Trotter seemingly argues that the court erred by preventing him from presenting evidence and effectively denying him a hearing on whether he should have been resentenced to life without parole in violation of the Eighth and Fourteenth Amendments. Trotter also claims the court abused its discretion in reaching its sentencing decision.

### A. Legal Standard

¶42. First, Trotter claims that he did not receive a *Miller* hearing and was denied the opportunity to present mitigating evidence related to his youth and attendant characteristics. However, this claim is contradicted by the record. The court's order "granted an evidentiary hearing on [Trotter's] claims for a new trial, alleged ineffective assistance of counsel, and resentencing under *Miller*" and scheduled "[s]aid evidentiary hearing" for August 31, 2018. At the hearing, Boone argued that resentencing under *Miller* was one of the issues pending before the court, but stated, "[Y]ou don't need an evidentiary hearing for that. That matter

is [ripe] for [the court's] consideration based on the law and some of the things we submitted to Your Honor." He then called several witnesses in support of Trotter's ineffective-assistance-of-counsel claim and Trotter's claim that he was entitled to a new trial based on Pittman's affidavit. At the conclusion of the hearing, Boone addressed the resentencing issue again. He argued:

> [A]t a minimum, whatever happens here today on these other issues, the [c]ourt to be consistent with *Miller* . . . must vacate the prior sentence and reinstate another sentence . . . of [life] with the possibility of parole. . . . And I don't think that you need any of the evidence that you've heard in the hearing . . . to decide that. You can decide all of that as a matter of law and in fact I don't think there's much legal argument that . . . that shouldn't be the result.

¶43. Trotter recognizes that in *Wharton v. State*, 298 So. 3d 921 (Miss. 2019), our supreme court held that "[c]onsistent with *Miller* and *Montgomery* [*v. Louisiana*, 577 U.S. 190 (2016)], prisoners . . . are entitled to relief under the PCR Act, *if* they can demonstrate that their life-without-parole sentence is unconstitutional under the Eighth Amendment. This requires showing that, under application of the *Miller* factors . . . , the offender's life-without-parole sentence is unconstitutional." *Wharton*, 298 So. 3d at 927 (¶¶26-27). It is true that the *Wharton* decision was handed down after Trotter's hearing, but this rule was established in another case well before Trotter's hearing. In *Jones v. State*, 122 So. 3d 698, 702 (¶14) (Miss. 2013), our supreme court held that a sentence of life without parole "can be applied constitutionally to juveniles who fail to convince the sentencing authority that *Miller* considerations are sufficient to prohibit its application." Therefore, Trotter should have known that he had the burden of showing that he should be resentenced to life with the

18

possibility of parole.

¶44. Trotter suggests that a sentence of life without parole is essentially void ab initio as applied to juveniles. However, the sentence itself is not unconstitutional; rather, it is unconstitutional to impose the sentence "absent consideration of the characteristics and circumstances unique to juvenile defendants . . . ." *Id*. at 702 (¶13); *see also Parker v. State*, 119 So. 3d 987, 997 n.14 (Miss. 2013) ("*Miller* does not require this Court [to] declare [a sentence of life without parole] per se unconstitutional as applied to juveniles."); *Montgomery*, 577 U.S. at 212 (holding that States are not required "to relitigate sentences . . . in every case where a juvenile offender received mandatory life without parole").

¶45. Trotter cites *Alexander v. State*, No. 2019-KA-01612-COA, 2021 WL 671340 (Miss. Ct. App. Feb. 22, 2021), *overruled*, in support of his argument that the circuit court did not hold a *Miller* hearing or prevented him from presenting evidence. In *Alexander*, the majority of this Court found that where the circuit court denied funds for an expert, the petitioner was deprived of the opportunity to present testimony and proof to support his claim that he had a right to be resentenced. *Id*. at *7 (¶23). Our supreme court recently reversed the majority's decision, holding that the trial court did not abuse its discretion by denying the motions for expert funding. *Alexander v. State*, 333 So. 3d 19, 21 (¶2) (Miss. 2022). Nevertheless, this case is distinguishable. Here, Trotter was given the opportunity to make a showing that his life-without-parole sentence was unconstitutional, but he failed to do so.

¶46. Finally, Trotter acknowledges that *Wharton* held that the evidentiary hearing could be held in the post-conviction matter. *See Wharton*, 298 So. 3d at 927 (¶¶26-27) ("Consistent

19

with *Miller* and *Montgomery*, prisoners . . . are entitled to relief under the PCR Act, *if* they can demonstrate that their life-without-parole sentence is unconstitutional under the Eighth Amendment."). But Trotter suggests that *Wharton*'s ruling should not apply because it was decided after his hearing and because it is irreconcilable with the United States Supreme Court's decision in *Jones v. Mississippi*, 141 S.Ct. 1307 (2021).

¶47. As noted by the State, the decision in *Jones* did not create any specific procedural requirement. *Id*. at 1321. It is obvious to this Court that Trotter is seeking to obtain what he was already given—an opportunity to present evidence in support of his *Miller* claim. The fact of the matter is that the court "granted an evidentiary hearing on [Trotter's] claims for a new trial, alleged ineffective assistance of counsel, and resentencing under *Miller*" and scheduled "[s]aid evidentiary hearing" for August 31, 2018. At the beginning of the hearing, Trotter's attorney represented that resentencing under *Miller* was one of the issues before the court but stated, "[Y]ou don't need an evidentiary hearing for that. That matter is [ripe] for [the court's] consideration based on the law and some of the things we submitted to Your Honor." Then, at the conclusion of the hearing, Trotter's attorney told the circuit court that it could decide "*as a matter of law*" and without any evidence presented at the hearing that his sentence should be vacated and that he should be resentenced to life with the possibility of parole. (Emphasis added). For these reasons, this claim is without merit.

### B. Abuse of Discretion

¶48. Trotter claims that the court abused its discretion by not basing its sentencing decision on any evidence and failing to acknowledge facts regarding Trotter's youth. He also suggests

20

that the court erred by considering his post-conviction conduct.

¶49. As to Trotter's claim that the circuit court did not base its decision on any evidence and disregarded his youth, we have already discussed that Trotter was given the opportunity to present evidence but failed to show that his sentence was unconstitutional. Trotter is to blame for any lack of evidence, not the court. In hindsight, Trotter may wish that he had presented more evidence, but the court evaluated the *Miller* factors based on the evidence before it. The court found:

> Trotter was under the age of 18 at the time of the crime . . . . There was no evidence that [he] was immature for his age. The evidence adduced in this matter does not show Trotter's action was impetuous, it appeared that he acted with premeditation, in that he parked away from the victim's house, walked to the house, identified himself as someone else, then shot and killed the victim. The evidence at the hearing clearly showed that Trotter had a caring and loving family. There is no evidence to suggest that the area or environment Trotter lived affected the love and care he received from his family.
>
> Trotter submitted a defense of not being the shooter and having no knowledge that a crime was about to be committed. The jury did not accept Trotter's defenses and found Trotter guilty of deliberate-design Murder.
>
> Further, . . . Trotter acted as the leader of the crime, no peer pressure or other pressure affected his decision to shoot at the time of the incident. There is no evidence that Trotter was incompetent because of his youth to the extent he could not assist his attorney in his defense.
>
> Finally, . . . there is no evidence of the possible rehabilitation of Trotter considering his scheme to have [his] co-defendant, Pittman[,] recant his testimony in order to get a new trial.

¶50. Trotter takes issue with the court's finding that Pittman recanted his testimony. It is true that Pittman did not testify at Trotter's trial. Rather, Trotter executed an affidavit stating that he was the shooter and later testified at the hearing that his affidavit was untruthful.

21

However, in the "Motion to Set Evidentiary Hearing and/or Resentencing Hearing," Trotter's own attorney used the term "recant" to support the claim that Trotter was entitled to a new trial based on Pittman's affidavit. Additionally, Trotter takes issue with the court's finding that he schemed with Pittman in order to obtain a new trial. Trotter argues that there was "no evidence of any 'scheme' by Trotter to fabricate the substance of that affidavit." However, Pittman testified that he was coached into writing the affidavit, and Trotter's female attorney told him that he could not be charged anymore. Additionally, Pittman testified that Trotter told him what to write. Finally, Trotter argues that the court's finding that it was his decision to shoot was "based entirely on speculation, since the only proof at the original trial was that it was Pittman who shot Hill, and the testimony at the evidentiary hearing confirmed that fact." However, a review of the trial transcript shows that Trotter's assertion that "the only proof at the original trial was that it was Pittman who shot Hill" is inaccurate and misleading. That assertion ignores Officer Grayson's testimony regarding Hill's identification of the shooter.

¶51. As to Trotter's claim that the court had no basis to assess incorrigibility on alleged post-conviction conduct, this Court previously did not find an abuse of discretion in a court's consideration of a petitioner's prison record and the court's finding that the petitioner did not show a significant possibility of rehabilitation. *Cook v. State*, 242 So. 3d 865, 875 (¶35) (Miss. Ct. App. 2017).

¶52. Finally, Trotter suggests that the circuit court was not free to decide that he was not immature for his age. However, the decision in *Miller* identified factors to be considered in

determining whether to impose a sentence of life without parole on a juvenile. *Miller*, 567 U.S. at 477. Among those factors include a consideration of the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.*

¶53. After review, we cannot say that the circuit court abused its discretion in denying Trotter's request to be resentenced to life with the possibility of parole. This claim is without merit.

## CONCLUSION

¶54. We find that the circuit court's denial of post-conviction relief should be affirmed. Trotter failed to prove that he was entitled to a new trial based on ineffective assistance of counsel. Additionally, under the circumstances of this case, the circuit court's decision to deny Trotter's request to be resentenced to life with the possibility of parole does not constitute reversible error.

¶55. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**